# AFFIDAVIT OF CAROLYN D. DUNBAR

STATE OF TEXAS         §
                                 §

COUNTY OF BEXAR     §

I, Carolyn D. Dunbar, being duly sworn, state the following:

1.       My name is Carolyn D. Dunbar. I am over the age of twenty-one and fully competent to make this affidavit. I have personal knowledge of the facts stated herein based on my employment with Morgan Stanley Smith Barney L.L.C., Citigroup Global Markets Inc. and its Smith Barney division, formerly known at Salomon Smith Barney Inc., and their predecessors. The factual matters stated herein are true and correct.

2.       I am currently employed by Morgan Stanley Smith Barney L.L.C. ("MSSB") as the Complex Risk Officer for MSSB branches located in San Antonio, Texas. In that capacity I have knowledge of and am familiar with MSSB's business operations and records. I am authorized to sign this affidavit, and am a custodian of records for MSSB and its predecessors.

3.       MSSB is the successor to the Smith Barney retail brokerage division of Citigroup Global Markets Inc., formerly known as Salomon Smith Barney Inc. ("CGMI"). Prior to June 1, 2009, I was employed by CGMI, and its predecessors for approximately 32 years. I began my employment in the retail securities industry with Shearson Loeb Rhodes Inc. in 1980. Following a merger with E.F. Hutton and Company, the firm was known as Shearson Lehman Hutton Inc., and was subsequently known as Shearson Lehman Brothers Inc. In 1993, Smith Barney, Harris Upham & Co., Incorporated acquired substantially all of the retail brokerage assets of Shearson Lehman Brothers Inc. Smith Barney then changed its name to Smith Barney Shearson Inc. The Smith Barney Shearson Inc. name was changed to Smith Barney Inc., and then to Salomon Smith Barney Inc. in 1998. In April 2003, Salomon Smith Barney Inc. changed its name to Citigroup Global Markets Inc. ("CGMI"). CGMI, and thus MSSB, is the successor to the retail brokerage operations of Shearson Lehman Hutton Inc., and Shearson Lehman Brothers Inc.

4.       In my employment, I served in numerous capacities, including the Regional Administrative Officer for CGMI for the region which included the San Antonio Smith Barney branches of Citigroup Global Markets Inc., including the branch in which the Dale and Klein Partnership and the K&R Family Limited Partnership accounts were serviced. Based on my prior employment by CGMI, f/k/a Salomon Smith Barney Inc., and its predecessors, I am familiar with and have knowledge of the business operations and records of CGMI and its predecessors. I was a Custodian of Records for CGMI and its predecessors at all relevant times. MSSB, CGMI and their predecessors regularly conduct and/or conducted business throughout the United States and their business includes and/or included transactions involving interstate commerce. MSSB, CGMI and their predecessors are/were members of the Financial Industry Regulatory Authority ("FINRA") and/or their regulatory predecessors, NASD and the NYSE.



EXHIBIT

_A_

5.     Attached as Exhibit 1 to this Affidavit is a true and correct copy of the Dale & Klein Partnership Account Application and Client Agreement, with non-relevant and/or confidential portions redacted. The Client Agreement indicates that it was signed by Roy Dale and Katie Klein on or about November 8, 1989. The account was originally opened under account no. 723-xxx00 with Shearson Lehman Hutton Inc., the predecessor to CGMI and MSSB. Attached as Exhibit 2 to this Affidavit is a true and correct copy of an additional Client Agreement for the Dale & Klein Partnership account, account no. 723-xxx00, dated December 12, 1989. As of the date of Exhibit 2, Shearson Lehman Hutton Inc. had changed its name to Shearson Lehman Brothers Inc.

6.     At the time Smith Barney, Harris Upham & Co. Incorporated acquired substantially all of the retail brokerage assets of Shearson Lehman Brothers Inc., and changed its name to Smith Barney Shearson Inc., the Dale & Klein Partnership account was given a new account no. (620-xxx32); the account was the same Dale & Klein Partnership account but was assigned a new number by Smith Barney Shearson Inc. as successor to Shearson Lehman Hutton Inc. and Shearson Lehman Brothers Inc.

7.     Attached as Exhibit 3 to this Affidavit is a true and correct copy, with non-relevant and/or confidential portions redacted, of the Account Application and Client Agreement for the K&R Family Limited Partnership. Exhibit 3 reflects that it was signed by Roy Dale and Katie Klein on or about November 8, 2002. The account was opened at Salomon Smith Barney Inc., which subsequently changed its name to Citigroup Global Markets Inc. The account continued under the same number following the change of name from Salomon Smith Barney Inc. to Citigroup Global Markets Inc.

8.     Attached as Exhibit 4 to this Affidavit is a true and correct copy of the Account Application and Client Agreement for the K&R Family Limited Partnership account no. 620-xxx5C. Exhibit 4 reflects that the account was opened on or about June 25, 2007 at Citigroup Global Markets Inc. and its division Smith Barney.

9.     The Client Agreements attached hereto as Exhibits 1 through 4 are maintained by MSSB and/or CGMI, and their predecessors, in the regular course of its business, and were made by, or from information transmitted by, an employee or representative with knowledge of the acts, events or conditions recorded in those records. It was the regular course of MSSB and/or CGMI's business and the business of their predecessors, to make and keep these records, and the records were made at or near the time, or reasonably soon thereafter, of the events and conditions recorded. The records attached hereto as Exhibit 1 through 4 are true and correct copies.

10.     Bryan J. Reece was at all relevant times an employee of CGMI. Mr. Reece is currently employed by MSSB.

Further Affiant sayeth not.

CAROLYN D. DUNBAR

Sworn and signed before the undersigned Notary Public on the 23rd day of FeBRuaRy, 2012.



Sandra Deskin

Notary Public in and for the State of Texas

NEW ACCOUNT MAIN OFFICE

NEW ACCOUNT APPLICATION
AND OPTION SUITABILITY

RELATED ACCT.

CPT 0001

123 ___ 00

DALE C KLEIN
PARTNERSHIP

SEE THE REVERSE SIDE OF PART 2 TO
DETERMINE THE DOCUMENTS REQUIRED
FOR EACH ACCOUNT CATEGORY.

1 ☐ IND Individual
2 ☐ JRS Joint (with rights of survivorship)
3 ☐ JTC Joint (tenancy in common)
4 ☐ INC Corporation
5 ☐ PAR Partnership
6 ☐ SOL Sole proprietorship
7 ☐ BAN Banking institution
8 ☐ BRO Broker/dealer
9 ☐ CLU Investment club
10 ☐ CMT Committee
11 ☐ CRG Conduit (IRA, SEP or Keogh, based on deceased account)
12 ☐ COM Community Property
13 ☐ CON Conservatorship
14 ☐ CUS Custodian
15 ☐ EDU Educational institution
16 ☐ ERI ERISA
17 ☐ ENT Estate (intestate)
18 ☐ TES Estate (testate)
19 ☐ TET Estate (Testate, Person Rep.)
20 ☐ GOV Government agency
21 ☐ GUA Guardianship
22 ☐ HDG Hedge fund
23 ☐ INS Insurance company
24 ☐ INO IRA (inside custody)
25 ☐ IRA IRA (individual)
26 ☐ SOL IRA (rollover)
27 ☐ SPO IRA (spousal)
28 ☐ EKRO Keogh (outside custodian)
29 ☐ KPM Keogh (principal, money purchase)
30 ☐ KAM Keogh (participant, money purchase)
31 ☐ KPP Keogh (principal, profit sharing)
32 ☐ KAP Keogh (participant, profit sharing)
33 ☐ EMP Easy corporate (principal, money purchase)
34 ☐ EMM Easy corporate (participant, money purchase)
35 ☐ EPO Easy corporate (principal, profit sharing)
36 ☐ EPO Easy corporate (participant, profit sharing)
37 ☐ LIF Life tenant
38 ☐ LIS Listed company
39 ☐ LIV Living trust (inter vivos)
40 ☐ MUT Mutual fund
41 ☐ NPO Non-profit/charitable organization
42 ☐ NVA Numbered (account provide by attorney by the Compliance Dept.)
43 ☐ REL Recognized religious organization
44 ☐ SFP Shearson Lehman Hutton Safekeeping plan
45 ☐ SOP SEP (outside custodian)
46 ☐ SPR SEP (principal)
47 ☐ SPA SEP (participant)
48 ☐ TBU Testamentary trust (UPWD)
49 ☐ USU Usufruct
50 ☐ UNI Unincorporated Association
51 ☐ HTC SLH Trust Company

Dale & Klein

Law Office          Attorneys

USE BLACK OR BLUE PEN
PRINT CLEARLY AND CAREFULLY.
PLEASE PRINT WITHIN THE SPACES
PROVIDED - DO NOT FILL IN ITEMS
EXTEND ABOVE OR BELOW THE LINES.

PRINT
LIKE
THIS     1 2 3 4 5
         6 7 8 9 0

REDACTED

EXHIBIT
1

ORIGINAL

Please read carefully, sign and return
To Shearson Lehman Hutton Inc.
American Express Tower
World Financial Center
New York, NY 10285-2700

# Client Agreement



In consideration of Shearson Lehman Hutton Inc. ("Shearson") accepting my account and agreeing to act as my broker, I agree to the following with respect to any of my accounts with you for extensions of credit and the purchase and sale of securities, put & call options, and other property. This agreement shall not become effective until accepted by you in your New York office. Acceptance may be evidenced by internal records maintained by you. Throughout this agreement, "I," "me," "my," "we," and "us" refer to the client and all others who are legally obligated on this account. "You" and "your" refer to Shearson, its subsidiaries, affiliates, officers, directors, agents and/or employees.

1. MY REPRESENTATIONS. I represent that I am of the age of majority according to the laws of my state of residence. I further represent that I am not an employee of any member or of a member firm of any exchange or of a member of the National Association of Securities Dealers, Inc. (the "NASD"), or of a bank, trust company, or insurance company unless I have notified you to that effect. If I become so employed, I agree to notify you promptly. I also represent that no persons other than those signing this agreement have an interest in the account.

2. DEFINITION OF "PROPERTY" The word "property" is used herein to mean securities of all kinds, monies, options, commodities, and contracts for the future delivery of, or otherwise relating to, commodities or securities and all other property usually and customarily dealt in by brokerage firms.

3. SHORT AND LONG SALES ORDERS; DELIVERIES AND SETTLEMENTS; LIMIT ORDERS. I agree that, in giving orders to sell, all "short" sales orders will be designated as "short" and all "long" sales orders will be designated as "long." "Short sale" means any sale of a security not owned by the seller or any sale that is consummated by delivery of a borrowed security. I also agree that you may at your discretion immediately cover any short sales in my account. The designation on a sale order as "long" is a representation on my part that I own the security, and if the security is not in your possession at the time of the contract for sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to my account. I agree that if you fail to receive payment for securities purchased you may, without prior demand and notice, sell securities or other property held by you in any of my accounts and any loss resulting therefrom will be charged to my account. By accepting my limit order for transactions in securities in the NASDAQ or over-the-counter market, you undertake to monitor the Interdealer market and to seek to execute my order only if the inside bid (in the case of a limit order to sell, the highest price at which a dealer is being quoted as willing to buy securities) or the inside asked (in the case of a limit order to buy, the lowest price at which a dealer is being quoted as willing to sell securities) reaches my limit price. You reserve the right, while my limit order remains unexecuted, to trade for your own market-maker account at prices equal to or better than my limit order price and not to execute my order against incoming orders from other customers. For example, if the inside market is 10 bid, 10¼ asked and I place a limit order to sell securities at 10¼, you will seek to execute my order only if the inside bid reaches my limit price of 10¼ (exclusive of any markdown or commission equivalent that you may charge in connection with the transaction), and while my order remains unexecuted, you may continue to sell securities for your market-maker account at prices at or above 10¼.

4. OPTION POSITIONS. I agree not to enter into any purchase or sale of equity, debt, foreign currency or index put & call options or Index Participations without having read and fully understood the terms, conditions and risks, as set forth in the Characteristics and Risks of Standardized Options booklet and/or Index Participations booklet, and applicable supplements which you agree to furnish me prior to such transactions. I understand clients' short option positions are assigned on a random selection method pursuant to an automated system. All short option positions can be assigned at any time including the day written.

5. NOTICE TO EXERCISE OPTIONS. If I purchase any listed option, I will notify you of my intention to exercise such option no later than two hours before the expiration time of the option (one hour in the case of an over-the-counter option). Failure to give such notice will constitute an abandonment of the option, in which event it may be exercised for my account if it would be profitable to do so. Except as required by the Options Clearing Corporation Rules, you have no obligation to exercise any option absent specific instructions from me to that effect. If it would not be profitable for my account due to commission expenses, it may be permitted to expire or, at your discretion, sold or acquired by you for some equitable payment to me based on your expenses and risk, without any liability or responsibility on your part to me.

6. IMPARTIAL LOTTERY ALLOCATION SYSTEM. When you hold on my behalf bonds or preferred stocks in street or bearer form which are callable in part, I agree to participate in the impartial lottery allocation system of the called securities in accordance with the provisions of the New York Stock Exchange ("NYSE") rules. Further, I understand when the call is favorable, no allocation will be made to any account in which you, your officers, or employees, have a financial interest until all other clients' positions in such securities are satisfied on an impartial lottery basis.

7. RESTRICTIONS ON TRADING. I understand that you may in your sole discretion prohibit or restrict trading of securities or substitution of securities in any of my accounts.

8. ORAL AUTHORIZATIONS. I agree that you shall incur no liability in acting upon oral instructions given to you concerning my accounts, provided such instructions reasonably appear to be genuine.

9. TRANSFER OF FUNDS; EXCHANGE RATE FLUCTUATIONS. You may transfer excess funds from my cash accounts to any of my other accounts for any reason, such as to avoid a margin call, not in conduct with the Commodity Exchange Act. If any transactions are effected on an exchange in which a foreign currency is used, any profit or loss as a result of a fluctuation in the exchange rate will be for my account.

10. TEMPORARY INVESTMENT OF FREE CREDIT BALANCES; BOND PRINCIPAL AND INTEREST PAYMENTS. I authorize, but do not require, you to automatically invest on a periodic basis the free credit balances in my accounts, including interest and dividends paid to me, in mutually selected money market funds or, in the absence of a selection by me, in preselected money market funds. You are not required to remit interest or dividends to me on a daily basis. With respect to bond principal and interest payments, you may redeem my money market fund shares, without notice, to the extent necessary to satisfy any debits arising in any of my accounts. I acknowledge that interest will not be paid to me on credit balances in any of my accounts unless specifically agreed to by you in writing. You may credit my appropriate account with principal and interest due on the payment dates and are entitled to recover any such payments from me if the same are not actually received by you from the trustee or paying agent.

11. FEES AND CHARGES. I understand that you may charge commissions and other fees for execution of transactions in purchases and sell securities, put & call options or other property, and I agree to pay such commissions and fees at your then prevailing rates. I also understand that such commission and fee rates may be changed from time to time without notice to me and I agree to be bound thereto. I may

be subject to a service charge on any of my accounts which produce no commission cover in any calendar year. You may apply this charge by notifying me by November 1. I agree to pay a late charge, to the extent permitted by law, if I purchase securities in my cash account and fail to pay for such securities by settlement date. Any late charge you may impose will be at the maximum rate of interest set forth in the Statement of Credit Terms and may be changed from the settlement date to the date of payment.

12. ACCURACY OF REPORTS, COMMUNICATIONS. Confirmation of orders and statements of my accounts shall be conclusive if not objected to in writing within ten days after mailing by you to me. Communications mailed to me at the address specified in the agreement shall, until you have received notice in writing from me of a different address, be deemed to have been personally delivered to me and I agree to waive all claims resulting from failure to receive such communications.

13. INTRODUCED ACCOUNTS. If my account has been introduced to you and is carried by you only as a clearing broker, I agree that you are not responsible for the conduct of the introducing broker and your only responsibilities in the relation to the execution, clearing and bookkeeping of transactions in my accounts.

14. SECURITY INTEREST. As security for the payment of all loans presently outstanding or to be made under this or any other agreement between us, and for all liabilities I may later owe to you now or in the future, I grant you a security interest in any and all property belonging to me or in which I may have an interest, held by you or carried in any of my accounts (individual or multiple owner), including commodity accounts. All property shall be subject to such security interest as collateral for the discharge of my obligations to you, wherever or however arising and without regard to whether or not you have made loans with respect to such property. You are hereby authorized to sell and/or purchase any and all property in any of my accounts or to liquidate any open commodity futures or forward contracts in any of my accounts without notice in order to satisfy any such obligations. In enforcing your security interest, you shall have this discretion to determine which property is to be sold and the order in which it is to be sold and which of my rights and remedies available to a secured party under the New York Uniform Commercial Code.

15. LIQUIDATION OF COLLATERAL OR ACCOUNT. You may sell any or all property held in any of my accounts and cancel any open orders for the purchase or sale of any property without notice in the event of my death or whenever in your discretion you consider it necessary for your protection. In such event you also may borrow or buy-in all property required to make delivery against any sale, including a short sale, effected for me. Such sale or purchase may be public or private and may be made without advertising or notice to me and in such manner as you may in your discretion determine. No demands, calls, tenders or notices which you may make or give in any one or more instances shall invalidate the foregoing waiver on my part. At any such sale you may purchase the property free of any right of redemption and I shall be liable for any deficiency in my accounts. Without your prior written consent, I will not cause or allow any of the collateral held in my account, whether now owned or hereafter acquired, to be or become subject to any lien, security interests, mortgages or encumbrances of any nature other than your security interest.

16. LOANS. From time to time you may, at your discretion, make loans to me for any purpose, including the purchase of securities, carrying or trading in securities ("Margin Loans") or for the purpose other than purchasing, carrying or trading in securities ("Express Credit Loans"). Pursuant to Regulation T, Margin Loans will be made in a Margin Account and Express Credit Loans will be made in a nonsecurities credit account ("Express Credit Account"). The minimum and maximum amount of any particular loan may be established by you in your discretion regardless of the amount of collateral delivered to you and you may charge such minimum and maximum amounts from time to time.

17. EXPRESS CREDIT. I agree not to use the proceeds of any Express Credit Loan to purchase, carry or trade in securities. I also agree not to use Express Credit Loan proceeds directly or indirectly to pay off other debt incur for the purpose of purchasing, carrying or trading in securities.

18. PAYMENT OF LOANS ON DEMAND. I agree to pay ON DEMAND any balance owing with respect to any of my accounts, including interest and commissions and any costs of collection (including attorneys' fees, if incurred by you). I understand that you may demand full payment of the balance due in my accounts plus any interest charges accrued thereon, at your sole option, at any time whichout cause and whether or not such demand is made for your protection. That is, loans are not made for any specific term or duration but rather are due and payable at your discretion upon a demand for payment made to me. I agree that you may at your sole option apply payments of interest, dividends, proceeds and principal received on any of the collateral, whether pursuant to the terms of such collateral or upon the sale of the collateral, to the payment of the balance due in my accounts or any other obligation.

19. MAINTENANCE OF COLLATERAL. I understand that the properties in my Margin Account and/or Express Credit Account may be carried in your general loans and may be pledged or hypothecated by you separately or in common with other properties. The pledge or hypothecation by you may secure your indebtedness equal to or greater than the amount owed to you by me. I agree to deposit additional collateral, as you may in your discretion require from time to time, in the form of cash, or securities in accordance with the rules and regulations of the Federal Reserve Board, the NYSE, the American Stock Exchange, Inc. ("AMEX"), other national securities exchanges, associations of regulatory agencies under whose jurisdiction you are subject and even lower minimum house margin maintenance requirements. In the event I no longer maintain a debit balance or any indebtedness to you, it is understood that you will fully segregate all securities in my accounts in your safekeeping or control (directly or through a clearing house) and/or deliver them to me upon my request.

20. INTEREST CHARGES AND PAYMENTS. I agree to pay interest, to the extent not prohibited by the laws of the State of New York, upon all amounts advanced and other balances due in my accounts in accordance with your usual custom, which may include the compounding of interest. Such custom, which may change from time to time, will be set forth in a Statement of Credit Terms or similar document, which is incorporated herein by reference. By entering into any transactions with you after I receive the Statement of Credit Terms, I acknowledge that I have read and agreed to the Statement of Credit Terms for all past and future transactions in my account. I understand that interest on all debit balances shall be payable ON DEMAND and that in the absence of any demand interest shall be due on the first business day of each interest period. My daily net debit balance will include accrued interest I have not paid from prior interest periods, if any. I understand that to the extent permitted by applicable law you may charge me interest on the unpaid interest previously added to my debit balance, that is, you may charge me compound interest. Payments of interest and principal and all other payments made by me under this agreement shall be made to your main office in New York, New York. You may, in your discretion, not claim any check or other remittance to constitute payment until it has been paid by the drawee and the funds representing such payment have become available to you.

ORIGINAL

REDACTED

PRINT YOUR NUMBERS LIKE THIS 1234567890

30250009892

21. CREDIT INFORMATION AND INVESTIGATION. I authorize you to obtain reports concerning my credit standing and my business conduct at your discretion. Upon my request you will inform me whether you have obtained credit reports and if you have, you will inform me of the name and address of the consumer reporting agency that furnished the reports to you.

22. JOINT ACCOUNTS:

a. If this is a Joint Account, we agree that each of us shall have authority on behalf of this account to buy, sell (including short sales), and otherwise deal in, through you as brokers, securities or options on margin or otherwise; to receive for the account, confirmations, statements and communications of every kind; to receive for the account and to dispose of money, securities and other property; to make, terminate, or modify for the account, agreements relating to these matters or waive any of the provisions of such agreements; and generally to deal with you as if each of us alone were the account owner, all without notice to the other account owners. We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account.

b. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all securities in this account, and make payments to any of us, of any or all monies in this account as any of us may order and direct, even if such deliveries and/or payments shall be made to one of us personally, and not for this account. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the said securities and/or monies so delivered or paid to any of us.

c. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such proceedings, require such documents, retain such portion and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of any of us who shall have died shall be liable and each survivor will be liable, jointly and severally, to you for any debt or loss in this account resulting from the completion of transactions initiated prior to your receipt of a written notice of such death or incurred in the liquidation of the account or the adjustment of the interests of the respective parties.

d. Any taxes or other expenses becoming a lien against or being payable out of the account as the result of the death of any of us, or through the exercise by his or her estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent. This provision shall not release the decedent's estate from any liability provided for in this agreement.

e. DESIGNATION OF TENANCY: This paragraph '22(e)' is not applicable in the State of Texas, where form No. 3882 "Texas Joint Account Supplement..." must be executed and returned with this agreement to you.

You may presume that it is the express intention of us to create an estate or account as joint tenants with rights of survivorship and not as tenants-in-common, unless otherwise provided by striking this paragraph and executing a separate Tenancy-in-Common form and returning it to you. In the event of the death of either or any of us, the entire interest in the joint account shall be vested in the survivor on the same terms and conditions as theretofore held, without in any manner releasing the decedent's estate from the liability. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by the joint tenants with respect to any matter concerning the joint account, including the giving or cancellation of orders and the withdrawal of moneys, securities or other property.

23. ARBITRATION AND GOVERNING LAW.

- Arbitration is final and binding on the parties.
- The parties are waiving their right to seek remedies in court, including the right to a jury trial.
- Pre-arbitration discovery is generally more limited than and different from court proceedings.
- The arbitrators' award is generally more limited than and different from court proceedings.
- The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.

- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

Any controversy: (1) arising out of or relating to any of my accounts maintained individually or jointly with any other party, in any capacity, with you; or (2) relating to my transactions or accounts with you and your predecessor firms by merger, acquisition or other business combination from the inception of such accounts; or (3) with respect to transactions of any kind executed by, through or with you, your officers, directors, agents and/or employees; or (4) with respect to this agreement, or the breach thereof, shall be resolved by arbitration conducted at the NYSE, NASD or AMEX or any self-regulatory organization ("SRO") subject to the jurisdiction of the Securities and Exchange Commission and pursuant to the arbitration procedures then in effect of any SRO as I may elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you will have the right to elect the arbitration tribunal of your choice. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof. This agreement shall be governed by the laws of the State of New York without giving effect to the choice of law or conflict of laws provisions thereof.

24. APPLICABLE REGULATIONS. All transactions for my accounts shall be subject to the regulations of all applicable federal, state and self-regulatory agencies including but not limited to the Securities and Exchange Commission, the various securities and commodity exchanges, the Municipal Securities Rulemaking Board, the NASD, the Board of Governors of the Federal Reserve System and the constitution, rules and customs of the exchange or market (and its clearing house, if any) where executed. Actual deliveries are intended on all transactions. I agree not to exceed the exercise limits and/or position limits set by the option exchanges, for my own account, acting alone or in concert with others.

25. BINDING EFFECT. This agreement and its terms shall be binding upon my heirs, executors, successors, administrators, assigns, committee and conservators ("successors"). In the event of my death, incompetency or disability, whether or not any successors of my estate and property shall have qualified or been appointed, you may continue to operate as though I were alive and competent and you may liquidate my account as described in Paragraph 15 above without prior notice to or demand upon my successors. This agreement shall inure to the benefit of your assigns and successors, by merger, consolidation or otherwise (and you may transfer my accounts to any such successors and assigns).

26. WAIVER NOT IMPLIED. Your failure to insist at any time upon strict compliance with this agreement or with any of its terms or any continued course of such conduct on your part shall not constitute or be considered a waiver by you of any of your rights.

27. SEVERABILITY. If any provision of this agreement is or becomes inconsistent with any applicable present or future law, rule or regulation, that provision will be deemed rescinded or modified in order to comply with the relevant law, rule or regulation. All other provisions of this agreement will continue and remain in full force and effect.

28. TERMINATION. You have the right to terminate any of my accounts (including multiple owner accounts) at any time by notice to me.

29. NO ORAL MODIFICATIONS; REVOCATION OF PRIOR AGREEMENTS. No modification of this agreement shall be effective unless in writing and executed by you and me. This agreement is not subject to any oral modification; the signing of this agreement revokes any prior Customer's or Client's Agreement, except those governing transactions in my commodity accounts, made with you or any of your predecessors, successors, assignors, or assigns. To the extent this agreement is inconsistent with any other agreement governing my account, the provisions of this agreement shall govern.

**Tax Certification:** Under penalties of perjury, I certify that the number shown below on this form is my correct taxpayer identification number or if not, then the number I have entered below per instructions is my correct taxpayer identification number, and that I am not subject to backup withholding because: (a) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (b) the IRS has notified me that I am no longer subject to backup withholding (see below), or (c) I am exempt from backup withholding (see below). *Note:* You must cross out (b) above if you are currently subject to backup withholding because of underreporting interest or dividends on your tax return. *For Those Exempt from Back-up Withholding (see instructions), write the word "Exempt" here:* _____

Unless I strike this paragraph and initial the same, you are hereby specifically authorized to lend, either separately or with other securities, to either yourself as broker or to others, any securities held by you on margin or as collateral for an Express Credit Loan for my/our accounts or as collateral therefor, or maintain a margin account. This agreement shall continue until signed notice of revocation is received by or from me and, in case of such revocation, it shall continue in effect as to transactions entered into prior thereto. By signing this agreement I acknowledge that my securities may be loaned to you or loaned out to others.

NOTICE: By signing this agreement, I give consent for you to record electronically any and all of my conversations (or those of my representatives) with you.

NOTICE: Any person, whether married, unmarried or separated, may apply for a separate account.
NOTICE: This agreement contains a pre-dispute arbitration clause, which is located on this page at paragraph 23.
NOTICE: By signing this agreement, I acknowledge receipt of a copy of this agreement.

**CAUTION   IT IS IMPORTANT THAT YOU THOROUGHLY TO CLIENT: READ THIS AGREEMENT BEFORE YOU SIGN IT.**

| Client's Signature | X [signature] | Date 11/8/89 | This Client's social security or tax identification number on SLH's records is: ▶ |
| Other Owner's Signature | X Katie O Klein | Date 11/8/89 | The social security number of this account is the number of the client whose name appears first. Please do not enter the joint account owner's number. |

All communications for this account are to be mailed to (name and address)
DALE A KLEIN PRTNR MIL SHIP
540 N. CAGE    SUITE 103
PHARR, TX 78577    PRINT YOUR NUMBERS LIKE THIS ▶ 1234567890

The social security or tax identification number shown above is incorrect. The CORRECT number is: ▶

Account Number
Branch | Account | T | C | FC
72B | 00

REDACTED

Please read carefully, sign and return

To Shearson Lehman Brothers Inc.

American Express Tower
World Financial Center
New York, NY 10285-2700

In consideration of Shearson Lehman Brothers Inc. ("Shearson") accepting my account and agreeing to act as my broker, I agree to the following with respect to any of my accounts with you for extensions of credit and the purchase and sale of securities, put & call options, and other property. This agreement does not govern transactions in my commodity accounts. This agreement shall not become effective until accepted by you in your New York office. Acceptance may be evidenced by internal records maintained by you. Throughout this agreement, "I," "me," "my," "we," "us" and "us" refer to the client and all others who are legally obligated on this account. "You" and "your" refer to Shearson.

1  MY REPRESENTATIONS  I represent that I am of the age of majority according to the laws of my state of residence. I further represent that I am not an employee of any exchange or of a member firm of any exchange or of a member of the National Association of Securities Dealers, Inc. (the "NASD"), or of a bank, trust company, or insurance company unless I have notified you to that effect. If I become so employed, I agree to notify you promptly. I also represent that no persons other than those signing this agreement have an interest in this account.

2  DEFINITION OF "PROPERTY"  The word "property" is used herein to mean securities of all kinds, monies, options, commodities, and contracts for the future delivery of, or otherwise relating to, commodities or securities and all other property usually and customarily dealt in by brokerage firms.

3  SHORT AND LONG SALES ORDERS; DELIVERIES AND SETTLEMENTS  I agree that, in giving orders to sell, all "short" sales orders will be designated as "short" and all "long" sales orders will be designated as "long." "Short sale" means any sale of a security not owned by the seller or any sale that is consummated by delivery of a borrowed security. I also agree that you may at your discretion immediately cover any short sales in my account. The designation as a sale order as "long" is a representation on my part that I own the security, and if the security is not in your possession at the time of the contract for sale, I agree to deliver the security to you by settlement date. In case of non-delivery of the security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to my account. I agree that if you fail to receive payment for securities purchased you may, without prior demand and notice, sell securities or other property held by you in any of my accounts and any loss resulting therefrom will be charged to my account.

4  OPTION POSITIONS  I agree not to enter into any purchase or sale of equity, debt, foreign currency or index put & call options without having read and fully understood the terms, conditions and risk, as set forth in the Characteristics and Risks of Standardized Options booklet which you agree to furnish me prior to such transactions. I understand clients' short option positions are assigned on a random selection method pursuant to an automated system. All short option positions can be assigned at any time including the day written.

5  NOTICE TO EXERCISE OPTIONS  If I purchase any listed option, I will notify you of my intention to exercise such option no later than two hours before the expiration time of the option (one hour in the case of an over-the-counter option). Failure to give such notice will constitute an abandonment of the option, in which event it may be exercised for my account if it would be profitable to do so. Except as required by the Options Clearing Corporation Rules, you have no obligation to to excise any option absent specific instructions from me so that permitted to expire or, at your discretion, sold or acquired by you for some equitable payment to me based on your expenses and risk, without any liability or responsibility on your part to me.

6  IMPARTIAL LOTTERY ALLOCATION SYSTEM  When you hold on my behalf bonds or preferred stocks in street or bearer form which are callable in part, I agree to participate in the impartial lottery allocation system of the called securities in accordance with the provisions of the New York Stock Exchange ("NYSE") rules. Further, I understand when the call is favorable, no allocation will be made to any account in which you, your officers, or employees, have a financial interest until all other clients' positions in such securities are satisfied on an impartial lottery basis.

7  RESTRICTIONS ON TRADING  I understand that you may in your sole discretion prohibit or restrict trading of securities or substitution of securities in any of my accounts.

8  ORAL AUTHORIZATIONS  I agree that you shall incur no liability in acting upon oral instructions given to you concerning my accounts, provided such instructions reasonably appear to be genuine.

9  TRANSFER OF LESS FUNDS; EXCHANGE RATE FLUCTUATIONS  You may transfer excess funds from any commodity accounts to any of my other accounts for any purpose, such as to avoid a margin call, not in conflict with the Commodity Exchange Act. If any transactions are effected on an exchange in which a foreign currency is used, any profit or loss as a result of a fluctuation in the exchange rate will be for my account.

10  TEMPORARY INVESTMENT OF FULL CREDIT BALANCES  I authorize but do not require you to automatically invest on a periodic basis the free credit balances in my accounts, including interest and dividends paid to me, in mutually selected money market funds or, in the absence of a selection by me, in prescribed money market funds. You are not required to remit interest or dividends to me on a daily basis. You may redeem my money market fund shares, without notice, to the extent necessary to satisfy any debits arising in any of my accounts. I acknowledge that interest will not be paid to me on credit balances in any of my accounts unless specifically agreed to you in writing.

11  FEES AND CHARGES  I understand that you may charge commissions and other fees for execution of transactions to purchase and sell securities, put & call options or other property, and I agree to pay such commissions and fees at your then prevailing rates. I also understand that such commission and fee rates may be changed from time to time without notice to me and I agree to be bound thereby. I must pay a service charge on any of my accounts which produce no commission revenue for any calendar year. The current service charge is $30. You

may change the service charge for the following calendar year by notifying me by October 1. I agree to pay a late charge, to the extent permitted by law, if I purchase securities in my cash account and fail to pay for such securities by settlement date. Any late charge you may impose will be at the maximum rate of interest set forth in the Statement of Credit Terms and may be charged from the settlement date to the date of payment.

12  ACCURACY OF REPORTS; COMMUNICATIONS  Confirmation of orders and statements of my accounts shall be conclusive if not objected to in writing within ten days after mailing by you to me. Communications mailed to me at the address specified in this agreement shall, until you have received notice in writing from me of a different address, be deemed to have been personally delivered to me and I agree to waive all claims resulting from failure to receive such communications.

13  INTRODUCED ACCOUNTS  If my account has been introduced to you and is carried by you only as a clearing broker, I agree that you are not responsible for the conduct of the introducing broker and your only responsibilities to me relate to the execution, clearing and bookkeeping of transactions in my account.

14  SECURITY INTEREST  As security for the payment of all loans presently outstanding or to be made under this or any other agreement between us, and for all liabilities I may have to you now or in the future, I grant you a security interest in any and all property belonging to me or in which I may have an interest, held by you or carried in any of my accounts (whether or not individually or jointly held), including commodity accounts. All property shall be subject to such security interest as collateral for the discharge of my obligations to you, wherever or whenever arising and without regard to whether or not you have made loans with respect to such property. You are hereby authorized to sell and/or purchase any and all property in any of my accounts or to liquidate any open commodity futures or forward contracts in any of my accounts without notice in order to satisfy such obligations. In enforcing your security interest, you shall have the discretion to determine which property is to be sold and the order in which it is to be sold and which of several contracts shall be closed, and any prior tender, demand or call of any kind upon me, or prior notice to me, shall not be considered a waiver of your right to sell or buy any such property or contracts at any time.

15  LIQUIDATION OF COLLATERAL OR ACCOUNT  You may sell any or all property held in any of my accounts and cancel any open orders for the purchase or sale of any property without notice in the event of my death or whenever in your discretion you consider it necessary for your protection. In such event you also may borrow or buy in any property required to make delivery against any sale, including a short sale, effected for me. Such sale or purchase may be public or private and may be made without advertising or notice to me and in such manner as you may in your discretion determine. No demands, calls, tenders or notices which you may make or give in any one or more instances shall invalidate the foregoing waiver on my part. At any sale you may purchase the property free of any right of redemption and I shall be liable for any deficiency in my accounts.

16  LOANS  From time to time you may, at your discretion, make loans to me for any purpose, including the purpose of purchasing, carrying or trading in securities ("Margin Loans") or for a purpose other than purchasing, carrying or trading in securities ("Express Credit Loans"). Pursuant to Regulation T, Margin Loans will be made in a Margin Account designated as "Margin Loans will be made in a subordinate credit account ("Express Credit Account"). The minimum and maximum amount of any collateral loan may be established by you in your discretion regardless of the amount of collateral delivered to you and you may change such minimum and maximum amounts from time to time.

17  EXPRESS CREDIT  I agree not to use the proceeds of any Express Credit Loan to purchase, carry or trade in securities. I also agree not to use Express Credit Loan proceeds directly or indirectly to repay other debt I incur for the purpose of purchasing, carrying or trading in securities.

18  PAYMENT OF LOANS ON DEMAND  I agree to pay ON DEMAND any balance owing with respect to any of my accounts, including interest and commissions and any costs of collection (including attorneys' fees, if incurred by you). I understand that you may demand full payment of the balance due in my accounts plus any interest charges accrued thereon, at your sole option, at any time without cause and whether or not such demand is made for your protection. This is, loans are not made for any specific term or duration but under an obligation payable at your discretion upon a demand for payment made to me. I agree that you may at your sole option apply payments of interest, dividends, premium and principal received on any of the collateral, whether pursuant to the terms of such collateral or upon the sale of the collateral, to the payment of the balance due in my accounts or pay such amounts to me.

19  MAINTENANCE OF COLLATERAL  I understand that the property in my Margin Account and/or Express Credit Account may be carried in your general loans and may be pledged or hypothecated by you separately or in common with other property. The pledge or hypothecation by you may secure your indebtedness to or others or may be for more than the amounts due to you by me. I agree to deposit additional collateral, as you may in your discretion require from time to time, in the form of cash or securities in accordance with the rules and regulations of the Federal Reserve Board, and NYSE, the American Stock Exchange, the other national securities exchanges, associations or regulatory agencies under whose jurisdiction you are subject and your own minimum house margin maintenance requirements. In the event I am no longer maintain a credit balance or the maintenance by me, I agree that you may at your sole option sell or purchase securities in my accounts to satisfy all applicable margin or maintenance clearing house) and/or deliver them to me upon my request.

20  LENDING AGREEMENT  You are hereby specifically authorized to lend, either to yourself or to others, any securities held by you on margin, and any such securities held by you on margin as collateral for an Express Credit Loan (or margin or maintenance purposes) at any time without notice to me. This agreement shall continue until signed notice of revocation is received by or from you and, in case of such revocation, it shall continue in effect as to transactions entered into prior thereto.

THE REVERSE SIDE OF THIS AGREEMENT MUST
BE SIGNED BY ALL ACCOUNT OWNERS

3026 (1/89)

EXHIBIT
2

REDACTED

21. **INTEREST CHARGES AND PAYMENTS.** I agree to pay interest, to the extent not prohibited by law...

22. **CREDIT INFORMATION AND INVESTIGATION.** I authorize you to obtain reports concerning my credit standing and my business conduct at your discretion. Upon my request you will inform me whether you have obtained credit reports and if you have, you will inform me of the name and address of the consumer reporting agency that furnished the reports to you.

23. **MULTIPLE OWNER ACCOUNTS.**

24. **ARBITRATION AND GOVERNING LAW.** This agreement shall be governed by the laws of the State of New York...

25. **APPLICABLE REGULATIONS.** All transactions for my accounts are subject to the regulations of all applicable federal, state and self-regulatory agencies...

26. **BINDING EFFECT.** This agreement and its terms shall be binding upon my heirs, executors, successors, administrators, assigns...

27. **WAIVER NOT IMPLIED.** Your failure to insist at any time upon strict compliance with this agreement...

28. **SEVERABILITY.** If any provision of this agreement is or becomes inconsistent with any applicable present or future law, rule or regulation...

29. **TERMINATION.** You have the right to terminate any of my accounts (including multiple owner accounts) at any time by notice to me.

30. **ORAL MODIFICATIONS; REVOCATION OF PRIOR AGREEMENTS.** This agreement is not subject to any oral modification...

31. **TAX CERTIFICATION.** Under penalties of perjury, I certify (1) that the number shown on this form is my correct taxpayer identification number and (2) that I am not subject to backup withholding...

By signing this agreement I acknowledge that my securities may be loaned to you or loaned out to others.

PLEASE READ IT CAREFULLY BEFORE YOU SIGN IT.

PRINT YOUR NUMBERS LIKE THIS [1234567890]

REDACTED

**21. INTEREST CHARGES AND PAYMENTS.** I agree to pay interest, to the extent not prohibited by the laws of the State of New York, upon all amounts advanced and other balances due in my accounts in accordance with your usual custom, which may include the compounding of interest. Your custom, which may change from time to time, will be set forth in a Statement of Credit Terms or similar document, which is incorporated herein by reference. By entering into any transactions with you after I receive the Statement of Credit Terms, I acknowledge that I have read and agreed to the Statement of Credit Terms for all past and future transactions in my account. I understand that interest on all debit balances shall be payable ON DEMAND and that in the absence of any demand interest shall be due on the first business day of each interest period. My daily net debit balance will include accrued interest I have not paid from prior interest periods, if any. I understand that to the extent permitted by applicable law you may charge me interest on the unpaid interest previously added to my debit balance: that is, you may charge me compound interest. Payments of interest and principal and all other payments made by me under this agreement shall be made to your main office in New York, New York. You may, in your discretion, not deem any check or other remittance to constitute payment until it has been paid by the drawee and the funds representing such payment have become available to you.

**22. CREDIT INFORMATION AND INVESTIGATION.** I authorize you to obtain reports concerning my credit standing and my business conduct at your discretion. Upon my request you will inform me whether you have obtained credit reports and if you have, you will inform me of the name and address of the consumer reporting agency that furnished the reports to you.

**23. MULTIPLE OWNER ACCOUNTS:**

a. If this is a Multiple Owner Account, we agree that each of us shall have authority on behalf of this account to buy, sell (including short sales), and otherwise deal in, through you as brokers, securities or options on margin or otherwise; to receive for the account, confirmations, statements and communications of every kind; to receive for the account and to dispose of money, securities and other property; to make, terminate, or modify the account, agreements relating to these matters or waive any of the provisions of such agreements; and generally to deal with you as if each of us alone were the account owner, all without notice to the other account owners. We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account.

b. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all securities in this account, and make payments to any of us, of any or all monies in this account as any of us may order and direct, even if such deliveries and/or payments shall be made to one of us personally, and not for this account. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the said securities and/or monies so delivered or paid to any of us.

c. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such proceedings, require such documents, retain such portion and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of any of us who shall have died shall be liable and each survivor will be liable, jointly and severally, to you for any debt or loss in this account resulting from the completion of transactions initiated prior to your receipt of a written notice of such death or incurred in the liquidation of the account or the adjustment of the interests of the respective parties.

d. Any taxes or other expenses becoming a lien against or being payable out of the account as the result of the death of any of us, or through the exercise by his or her estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent. This provision shall not release the decedent's estate from any liability provided for in this agreement.

e. DESIGNATION OF TENANCY: this paragraph '23(e)' is not applicable in the State of Texas, where form No. 3882 "Texas Joint Account Supplement..." must be executed and returned with this agreement to you.

i. Joint Tenants with Rights of Survivorship/when one dies his or her interest passes to the survivor(s).

You may presume that it is the express intention of us to create an estate or account as joint tenants with rights of survivorship and not as tenants-in-common, unless otherwise provided by striking this paragraph ('i') and filling in the terms of paragraph ('ii') hereafter. In the event of the death of either or any of us, the entire interest in the joint account shall be vested in the survivor on the same terms and conditions as theretofore held, without in any manner releasing the decedent's estate from the liability.

ii. Tenants-In-Common without Rights of Survivorship/when one dies, his or her interest passes to his or her estate.

You may presume that if we strike paragraph ("i") above and fill in the terms of this paragraph ("ii") below, it is our express intention to create an estate or account as tenants-in-common without rights of survivorship and not as joint tenants. Our interests in the account shall be set forth below. In the event of the death of either or any of us, the interests in the account shall be determined as of the close of business on the date of death of the decedent (or on the next following business day if the date of death is not a business day) as follows:

| *Name of Tenant | or his or her estate | % |
| *Name of Tenant | or his or her estate | % |
| *Name of Tenant | or his or her estate | % |

Note: Total percentages must equal 100%.

*Indicate names and percentage amounts of the interests of each tenant. The only names to be inserted are those of the present owners of the account: heirs or beneficiaries CANNOT be designated on this form.

**24. ARBITRATION AND GOVERNING LAW.** This agreement shall be governed by the laws of the State of New York without giving effect to the choice of law or conflict of laws provisions thereof. Any controversy arising out of or relating to any of my accounts, to transactions with you, your officers, directors, agents and/or employees for me, or to this agreement, or the breach thereof, or relating to transactions or accounts maintained by me with any of your predecessor firms by merger, acquisition or other business combination from the inception of such accounts, shall be settled by arbitration, in accordance with the rules then in effect of the NASD, or the Boards of Directors of the NYSE or the American Stock Exchange, Inc., as I may elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such an election, then you will have the right to elect the arbitration tribunal of your choice. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

**25. APPLICABLE REGULATIONS.** All transactions for my accounts shall be subject to the regulations of all applicable federal, state and self-regulatory agencies including but not limited to the Securities and Exchange Commission, the various securities and commodity exchanges, the Municipal Securities Rulemaking Board, the NASD, the Board of Governors of the Federal Reserve System and the constitution, rules and customs of the exchange or market (and its clearing house, if any) where executed. Actual deliveries are intended on all transactions. I agree not to exceed the exercise limits and/or position limits set by the option exchanges, for my own account, acting alone or in concert with others.

**26. BINDING EFFECT.** This agreement and its terms shall be binding upon my heirs, executors, successors, administrators, assigns, committee and conservators ("successors"). In the event of my death, incompetency, or disability, whether or not any successors of my estate and property shall have qualified or been appointed, you may continue to operate as though I were alive and competent and you may liquidate my account as described in Section 15 above without prior notice to or demand upon my successors. This agreement shall inure to the benefit of your assigns and successors, by merger, consolidation or otherwise (and you may transfer my accounts to any such successors and assigns).

**27. WAIVER NOT IMPLIED.** Your failure to insist at any time upon strict compliance with this agreement or with any of its terms or any continued course of such conduct on your part shall not constitute or be considered a waiver by you of any of your rights.

**28. SEVERABILITY.** If any provision of this agreement is or becomes inconsistent with any applicable present or future law, rule or regulation, that provision will be deemed rescinded or modified in order to comply with the relevant law, rule or regulation. All other provisions of this agreement will continue and remain in full force and effect.

**29. TERMINATION.** You have the right to terminate any of my accounts (including multiple owner accounts) at any time by notice to me.

**30. NO ORAL MODIFICATIONS; REVOCATION OF PRIOR AGREEMENTS.** This agreement is not subject to any oral modification; the signing of this agreement revokes any prior Customer's or Client's Agreement, except those governing transactions in my commodity accounts, made with you or any of your predecessors, successors, assignors, or assigns. To the extent this agreement is inconsistent with any other agreement governing my account, the provisions of this agreement shall govern.

**TAX CERTIFICATION.** Under penalties of perjury, I certify (1) that the number shown on this form is my correct taxpayer identification number and (2) that I am not subject to backup withholding as a result of failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding. (I understand that if I have been notified by the IRS that I am subject to backup withholding as a result of dividend or interest underreporting, I must cross out the information contained in clause (2) of this paragraph.)

**By signing this agreement I acknowledge that my securities may be loaned to you or loaned out to others.**

REMINDER: If this is a tenancy-in-common, be sure to fill out the chart in paragraph 23(e)(ii).

NOTICE: Any person, whether married, unmarried or separated, may apply for a separate account.

**CAUTION** IT IS IMPORTANT THAT YOU THOROUGHLY TO CLIENT: READ THIS AGREEMENT BEFORE YOU SIGN IT.

| Client's Signature | Date | Other Owner's Signature | Date |
| X | 12-12-89 | X | |

All communications for this account are to be mailed to: KATIE PEARSON KLEIN MANAGING PARTNER

Name and Address: DALEY KLEIN PARTNERSHIP
840 N. CAGE SUITE 103
PHARR TX 78577

PRINT YOUR NUMBERS LIKE THIS 1234567890

Account Number
Branch     Account     T   C   FC.
723        CCT

The Social Security or Tax ID Number on Shearson Lehman's Records Is:

The Social Security or Tax ID Number should be: (do not enter dashes)

REDACTED

# Account Application, Client Agreement and Substitute Form W-9 Request for Taxpayer Identification Number

## SALOMON SMITH BARNEY
A member of citigroup

| Account Number | | | | |
|---|---|---|---|---|
| Branch | Account | | T | C | FC |
| 820 | | 91 | | | |

**Account Ownership / List all account owners:**

*K+R Family Limited Partnership*

*Katie P Klein & Roy S. Dale – G/P*

**Account Address:**

Street 1

City *McAllen, TX* 78504

**Mailing Address for this account(s)**

**Permanent/ Legal Address for this account(s) (if different)**

| Date of Birth of Account Owner named first above | Month | Day | Year | Citizenship ☑ U.S. ☐ U.S. Permanent Resident Alien; Country of citizenship is: |
|---|---|---|---|---|

This account is for (check the appropriate box): ☐ Individual/Sole Proprietor ☐ Corporation ☑ Partnership ☐ Specify Other

| Enter the Social Security Number of the Account Owner named first above OR the Employer Identification Number (if not an individual): | Social Security No. | OR | Employer Identification No. |
|---|---|---|---|

| Daytime Phone No. | Evening Phone No. | Fax No. (optional) | E-Mail Address (required for online accounts) |
|---|---|---|---|

### Borrowing Privilege

Portfolio CreditLine® allows you to borrow against the value of eligible securities in your account for almost any investment, personal or business purpose. Eligible accounts will have Portfolio CreditLine borrowing privileges unless you decline below. See accompanying literature for an explanation of Portfolio CreditLine borrowing.

☐ If/We do not want Portfolio CreditLine borrowing privileges in my/our account. *Please note that you may not obtain an FMA Card (below) if you check this box.*

### Salomon Smith Barney Access®

With Salomon Smith Barney Access™ you can view account information, stock quotes, research and other information on the internet. Enrollment is easy at www.salomonsmithbarney.com

Speak to your Financial Consultant regarding our free SSB Access Internet Bill Pay service.

*Mother's Maiden Name is required to enroll online.* | Mother's Maiden Name

### FMA Checking

Checkwriting privilege provide you with convenient access to your money. All check information is reported on your monthly statement, including payee name and data written. Expense codes give you the option to categorize payments for tracking on your monthly and year-end statements.

*Please select your printing preference:* | *Please select your check style:*

☑ Name and address | ☑ Wallet size | ☐ Executive (additional charge)

☐ Name only; no address | | ☐ Corporate (additional charge)

*Multiple owner accounts: Please tell us if one or two signatures are required to authorize checks.* | ☑ One signature is required | ☐ Two signatures are always required

### FMA Card

The FMA Card is a Gold MasterCard® debit card that gives you easy access to cash at over 600,000 ATM machines and purchasing power at over 19 million locations. Enroll in our optional Travel & Rewards program and earn points towards exciting merchandise, restaurants and air travel rewards with every qualifying purchase. No annual card fee applies.

*How should the account owner's (primary cardmember's) information appear?*

| Account Owner's Name should Appear as: | | Home Phone Number |
|---|---|---|
| Social Security Number | Mother's Maiden Name | |

*How should the account co-owner's information appear?*

| Account Co-Owner's Name should Appear as: | | Home Phone Number |
|---|---|---|
| Social Security Number | Mother's Maiden Name | |

**Travel & Rewards** ☐ Yes, sign my FMA Card(s) up for the Travel & Rewards program so I can begin earning points with my first eligible purchases. A $30 annual membership fee may apply.

### Additional FMA Privileges

The following services are also available when you establish your FMA account. Speak with your Financial Consultant for more details.

Idle cash will be swept daily into your choice of:
☐ Bank Deposit Program – FDIC-insured deposits in affiliated Citigroup banks (Note: not available for managed accounts or business accounts.)
☐ Tax-free money market fund selection.
☐ Insured savings deposits through the IDA feature.

☐ Dividend Reinvestment. Reinvest dividends into additional shares without transaction fees. Speak to your Financial Consultant to select which dividends to reinvest.

☐ Direct Deposit. Your employer, pension plan or Social Security can send payments directly to your account. Contact the payer directly to enroll.

FOR 3025 (9/2002) / Page 1 of

REDACTED

**EXHIBIT**

tabbies 3

| Account Number | | | | |
|---|---|---|---|---|
| Branch **820** | Account **91** | T **10** | FC | |

## FMA Automatic Funds Transfers

Transfer money between your FMA account and either your bank or another Salomon Smith Barney account (SSB account) that has been linked to your FMA account for convenient reporting purposes.

Attach a voided check or a letter from your bank confirming the account number, title, account type (checking or savings) and the bank routing number (not required for transfers to SSB accounts). Your bank account or SSB account must have the name of at least one FMA account owner in the title.

| Financial Institution | ☐ Check if Credit Union | Account Number | | Type of Account: ☐ Checking ☐ Savings |
|---|---|---|---|---|
| Select your Telephone Authorization Code: (numbers only): | | | SSB Account AFT: Contact your Financial Consultant to obtain Electronic Client ID or to enable an existing one. | |

| OPTIONAL - Complete only if you wish to establish monthly or biweekly recurring transfers. | ☐ Check here for recurring transfers INTO your FMA account FROM your bank account. ☐ Check here for recurring transfers FROM your FMA account INTO your bank or Salomon Smith Barney account. | Amount of Transfer | Monthly, on the ____ or Weekly on ☐ Mon ☐ Tue ☐ Wed ☐ Thu ☐ Fri day of each month (specify the 1st through 28th) |
|---|---|---|---|
| Complete this section only if your bank or SSB account title includes someone who is not a co-owner of your FMA. | I authorize Salomon Smith Barney Inc. ("SSB") to initiate transfers and make adjustments for entries made in error to or from my account indicated above, in accordance with the terms of the FMA Agreement, which I have read and agree to. This authorization is to remain in full force and effect until SSB has received notification from me of its termination. | | |
| | Account Title | Signature of non-FMA owner(s) | Date |

---

## Quicken® or Microsoft® Money

With a Salomon Smith Barney Financial Management Account, you may track your account transactions and activity with Quicken®, QuickBooks®, or Microsoft® Money software. Fees may apply. Please ask your Financial Consultant for an application.

## FMA PLUS℠

☐ Establish my account as an FMA PLUS. I will benefit from fee waivers on up to 100 ATM withdrawals per year with my FMA Card, no monthly fee for downloading data to Quicken or Microsoft Money, a complimentary IRA, linked to my account, and premier statement reporting. *Speak with your Financial Consultant for details on statement reporting and IRA services. Not available for Business FMA accounts.*

**Name Disclosure**   The issuers of securities we hold for you in street name may request your name, address and securities position.
This information will not be released if you check this box ☑

Bank issued certificates of deposit purchased through Salomon Smith Barney, the Salomon Smith Barney Bank Deposit Program℠ and the Salomon Smith Barney Insured Deposit Account sweep features are insured by the FDIC (see disclosure documents for details). All other investment or insurance products sold through Salomon Smith Barney Inc.
•are not insured by the FDIC;
•are not a deposit or other obligation of a depository institution and are not guaranteed by a depository institution;
•are subject to investment risks, including the possible loss of the principal amount invested.

In consideration of Salomon Smith Barney Inc. ("SSB") accepting an account for me/us, I/we ("I") acknowledge that I have read, understand and agree to the terms of the attached Client Agreement in sections 1 through 11. If this is a multiple party account, I/we further acknowledge that I/we have read, understand and agree to the terms of the attached Client Agreement contained in sections 12 through 14. If I have requested Salomon Smith Barney Access, I have read, understand, and agree to the terms of the Salomon Smith Barney Access Agreement. If I have requested any of the services referenced in the FMA sections above, I agree to the terms of the FMA Agreement that has been provided to me and understand that both an account minimum balance and annual fee apply. I authorize SSB to establish checking privileges, Online Services and the Automatic Funds Transfer service, and to have the FMA Card(s) issued or instructed on this Account Application, and I affirm that I have the authority to open this account. I authorize SSB and the FMA Card Issuer to have FMA Card(s) issued as indicated. I understand that this account is governed by the FMA Agreement, the Client Agreement, the Online Services Agreement, my agreement with the FMA Card Issuer, the Bank Deposit Program Disclosure Document, the IRA Disclosure Document, and/or other agreements I may have with SSB or other providers of services related to the FMA account. I have read all these documents and agree to their terms.
If this account is established with Portfolio CreditLine privileges, I further acknowledge that I have read, understand and agree to the terms of the attached Client Agreement contained in sections 15 through 17 and that my/our securities may be loaned to you or loaned out to others.

**Tax Certification:** Under penalties of perjury I certify that:

1.) the number I have provided above is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and
2.) I am not subject to backup withholding because: a.) I am exempt from backup withholding, or b.) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or c.) the IRS has notified me that I am no longer subject to backup withholding.
3.) I am a U.S. person (including a U.S. resident alien)

**Certification Instructions:** You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

Salomon Smith Barney Inc. requires your consent to the applicable provisions of this Agreement in order to open and maintain your accounts.

| | I acknowledge that I have received the Client Agreement which contains a pre-dispute arbitration clause in section 6. | The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. |
|---|---|---|
| **All accounts owners must sign.** *If FMA Checking is requested, please sign as you will normally sign your checks.* | Account Owner's Signature | Date 11/8/02 |
| | Co-Owner's Signature | Date 11/8/02 |

REDACTED

FCR 8208 (R/2002) / Page 2 of 4

# CLIENT AGREEMENT

In consideration of your opening one or more accounts for me ("we", "us" and "our" are each substituted for "I", "me" and "my", respectively, in the case of multiple account holders, corporations and other entities), and your agreeing to act as broker/dealer for me for the extension of credit and in the purchase or sale of securities, commodities, options and other property, it is agreed in respect to any and all accounts, whether upon margin or otherwise, which I now have or may at any future time have with Salomon Smith Barney Inc. or its direct or indirect subsidiaries and affiliates or their successors or assigns (hereinafter referred to as "you" or "your" or "SSB"), that:

1. All transactions entered into under this Agreement shall be subject to any applicable constitution, rules, regulations, customs and usages of the exchange or market and its clearinghouse, if any, where such transactions are executed by SSB or its agents and to all applicable laws, rules and regulations of governmental authorities and self-regulatory agencies. Such reference to the "constitution, rules, regulations, customs and usages of the exchange" shall in no way be construed to create a cause of action arising from any violation of such constitution, rules, regulations, customs and usages. If any provision is enacted that would be inconsistent with any of the provisions of this Agreement, the provision so affected shall be deemed modified or superseded by the enactment, but the remaining provisions of this Agreement shall remain in effect. Except as herein provided, no provision of this Agreement may be waived, altered, modified or amended unless the same is in writing and signed by an authorized official of SSB.

2. I agree that all property which I own or in which I have an ownership interest, whether owned individually, jointly or in the name of another person or entity, which at any time may be in your possession or control for any purpose, including safekeeping, shall be subject to a continuing security interest, lien and right of set-off for the discharge and satisfaction of any debts or obligations however arising that I may owe to SSB at any time and for any reason. SSB may at its discretion hold such property until my debts or obligations to SSB are fully satisfied or SSB may apply such property and the proceeds of the liquidation of such property toward the satisfaction of my debts and obligations and I will remain liable to SSB for any deficiency. In enforcing your security interest, you shall have the discretion to determine which property is to be sold and the order in which it is to be sold and shall have all the rights and remedies available to a secured party under the New York Uniform Commercial Code. Without your prior written consent, I will not cause or allow any of the collateral held in my account(s), whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances of any nature other than your security interest.

Without limiting the generality of the foregoing, I hereby authorize SSB to automatically liquidate any money market fund shares or withdraw any savings deposit balances available in my account(s) from time to time to cover any of my indebtedness or obligations to SSB including non-trade related debts. You are further authorized to liquidate any other property held in my account(s) to satisfy any such indebtedness or obligations whenever in your discretion you consider it necessary for your protection.

You are hereby authorized without further direction from me to automatically deposit or "sweep" all the free credit balances in my account into one or more FDIC insured depository institutions ("Program Banks") affiliated with you as more particularly set forth in the disclosure document which I represent that I have read and by which I agree to be bound. I understand that you may amend the list of Program Banks and that I may eliminate any Program Bank from the list at any time. If my free credit balances that are swept into the Program Banks reach the maximum amount that I have authorized you on my behalf to deposit or that may be so deposited under the Bank Deposit Program ("Program"), you are authorized to sweep, without further direction from me, my excess eligible free credit balances into the SB Money Fund portfolio that I have chosen.

I acknowledge (i) that I am responsible to monitor the total amount of deposits I have at each Program Bank in order to determine the extent of Federal Deposit Insurance Corporation insurance coverage available to me, and (ii) that Salomon Smith Barney is not responsible for any insured or uninsured portion of my deposits at any of the Program Banks.

I understand that I may instruct you not to sweep the free credit balances in any of my accounts into a Program Bank account but instead to sweep such free credit balances into a tax exempt money market fund. If I so instruct you, you are authorized, without further direction from me, to invest any eligible free credit balances in any of my accounts in the tax exempt money market fund you make available and that I have chosen.

If I have elected the Insured Deposit Account ("IDA") feature as my sweep, you are authorized without further direction from me to invest eligible free credit balances in my accounts in savings deposits at the depository institutions in the order set forth on the list furnished to me from time to time. I understand that you may amend the list of depository institutions and that I may eliminate depository institutions from the list at any time. If my funds invested through the IDA feature reach the maximum amount that I have authorized you to so invest or that may be so invested, you are authorized to invest excess eligible free credit balances in the money market fund I have chosen or you have chosen pursuant to my authorization. I have read the IDA Disclosure Document and agree to be bound by its terms and conditions.

"Property" as used anywhere in this Agreement shall include, but not be limited to, investment property, securities and commodities accounts, securities of all kinds, money, savings deposits, certificates of deposit, bankers' acceptances, commercial paper, options, commodities, and contracts for the future delivery of commodities or relating to commodities or securities, and the distributions, proceeds, products and accessions of any of the above. All property held in a

securities account shall be treated as a financial asset under Article 8 of the New York Uniform Commercial Code.

3. In case of the sale of any security, commodity, or other property at my direction and the inability of SSB to deliver the same to the purchaser by reason of my failure to supply them to SSB, I authorize SSB to borrow any security, commodity, or other property necessary to make delivery thereof, and I hereby agree to be responsible for any loss which SSB may sustain thereby and any premiums, interest or other costs which SSB may be required to pay as a result of such borrowing, and for any loss or cost which SSB may sustain by reason of its inability to borrow the security, commodity, or other property sold.

I agree that if I utilize your services to receive or issue funds by wire (wire transfers), I am responsible for the issuance of accurate and complete instructions in relation to said wire transfers and I will hold you harmless from all liabilities if I fail to fulfill this responsibility. I further agree that should I incur a loss in connection with a wire transfer as a result of negligence or other activities on your part, your liability will be limited to the actual amount of the misdirected or misapplied funds and no other damages of any other nature including consequential damages will be recoverable.

You may charge my account(s) with such usual and customary charges as you may determine to cover your services and facilities, including, but not limited to, custody, transaction and termination fees. In addition, you may charge an inactivity fee which once charged, shall be nonrefundable. I will promptly pay SSB any deficiency that might arise in my account(s). I understand and agree that a finance charge may be charged on any debit balance in any cash account I have with SSB in accordance with the terms described in the SSB literature previously provided to me and any subsequent modifications thereto which will be provided to me. You may transfer excess funds between any of my accounts (including commodity accounts) for any reason not in conflict with the Commodity Exchange Act or any other applicable law. If any transactions are effected on an exchange in which a foreign currency is used, any profit or loss as a result of a fluctuation in the exchange rate will be charged or credited to my account(s).

4. Communications may be sent to the mailing address on file with you, or at such other address as I may hereafter give in writing, and all communications so sent, whether by mail, telegraph, messenger or otherwise, shall be deemed given to me personally, whether actually received or not. I acknowledge that the rules of the Securities and Exchange Commission require that certain communications be sent to me rather than an agent acting on my behalf. I warrant that the address currently on file with you is an address where I personally receive communications unless it is the address of a qualified custodian as defined by the Securities and Exchange Commission. Transactions entered into for my account(s) shall be confirmed in writing to me where required by applicable law or regulation. In addition, SSB shall provide me with periodic statements reflecting activity in such account(s). I agree that transactions reflected on such confirmations and statements shall be conclusively deemed accurate as stated unless I notify SSB in writing within three (3) days and ten (10) days of receipt, respectively, that the information contained in such confirmation or statement is inaccurate. Such notice must be sent by me to SSB by telegram or letter directed to the attention of the Branch Office Manager of the office servicing the account. Failure to so notify SSB shall also preclude me from asserting at any later date that such transaction was unauthorized.

I authorize you at your discretion to obtain reports and to provide information to others concerning my credit standing and my business conduct. You may ask credit reporting agencies for consumer reports of my credit history. Upon my request you will inform me whether you have obtained any such consumer reports and if you have, you will inform me of the name and address of the consumer reporting agency that furnished the reports to you.

5. I hereby represent that I am of the age of majority. Unless I advise you to the contrary, in writing, and provide you with a letter of approval from my employer, where required, I represent that I am not an employee of any exchange, or of any corporation of which any exchange owns a majority of the capital stock, or of a member of any exchange, or of a member firm or member corporation registered on any exchange, or of any corporation, firm or individual engaged in the business of dealing, either as a broker or as principal, in securities, bills of exchange, acceptances or other forms of commercial paper. I further represent that no one except those signing this agreement has an interest in my account.

If my account has been introduced to you and is carried by you only as a clearing broker, I agree that you are not responsible for the conduct of the introducing broker and your only responsibilities to me relate to the execution, clearing and bookkeeping of transactions in my accounts.

## 6. Arbitration
- **Arbitration is final and binding on the parties.**
- **The parties are waiving their right to seek remedies in court, including the right to jury trial.**
- **Pre-arbitration discovery is generally more limited than and different from court proceedings.**
- **The arbitrators' award is not required to include factual findings or legal reasoning, and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.**
- **The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**

I agree that all claims or controversies, whether such claims or controversies

arose prior, on or subsequent to the date hereof, between me and SSB and/or any of its present or former officers, directors, or employees concerning or arising from (i) any account maintained by me with SSB individually or jointly with others in any capacity; (ii) any transaction involving SSB or any predecessor firms by merger, acquisition or other business combination and me, whether or not such transaction occurred in such account or accounts; or (iii) the construction, performance or breach of this or any other agreement between us, any duty arising from the business of SSB or otherwise, shall be determined by arbitration before, and only before, any self-regulatory organization or exchange of which SSB is a member. I may elect which of these arbitration forums shall hear the matter by sending a registered letter or telegram addressed to Salomon Smith Barney Inc. at 77 Water Street, New York, N.Y. 10005, Attn: Law Department. If I fail to make such election before the expiration of five (5) days after receipt of a written request from SSB to make such election, SSB shall have the right to choose the forum.

No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class is decertified; or (iii) the customer is excluded from the class by the court.

Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

7. The provisions of this Agreement shall be continuous, shall cover individually and collectively all accounts which I may open or reopen with SSB, and shall inure to the benefit of SSB's present organization, and any successor organization or assigns; and shall be binding upon my heirs, executors, administrators, assigns or successors in interest. Should any term or provision of this Agreement be deemed or held to be invalid or unenforceable, the remaining terms and provisions shall continue in full force and effect. Except for statutes of limitation applicable to claims, this Agreement and all the terms herein shall be governed and construed in accordance with the laws of the State of New York without giving effect to principles of conflict of laws. The statute of limitations applicable to any claim shall be that which would be applied by the courts of the state in which I reside.

8. I understand that you may in your sole discretion prohibit or restrict trading of securities or substitution of securities in any of my accounts. You have the right to terminate any of my accounts (including multiple owner accounts) at any time by notice to me. The provisions of this agreement shall survive the termination of any account.

9. Your failure to insist at any time upon strict compliance with any term of this Agreement, or any delay or failure on your part to exercise any power or right given to you in this Agreement, or a continued course of such conduct on your part shall at no time operate as a waiver of such power or right, nor shall any single or partial exercise preclude any other further exercise. All rights and remedies given to you in this Agreement are cumulative and not exclusive of any other rights or remedies which you otherwise have.

10. I understand that SSB shall not be liable for loss caused directly or indirectly by government restrictions, exchange or market rulings, suspension of trading, war, strikes or other conditions, commonly known as "acts of God," beyond SSB's control.

11. From time to time you may at your discretion, make loans to me for a purpose other than purchasing, carrying or trading in securities ("Express Credit Loans"). Express Credit Loans will be made in a nonsecurities credit account ("Express Credit Account"). The minimum and maximum amount of any particular loan may be established by you in your discretion regardless of the amount of collateral delivered to you and you may change such minimum and maximum amounts from time to time.

I agree not to use the proceeds of any Express Credit Loan to purchase, carry or trade in securities. I also agree not to use Express Credit Loan proceeds directly or indirectly to repay other debt that I incur for the purpose of purchasing, carrying or trading in securities.

Additional Terms for Multiple Party Accounts
Paragraphs 12 through 14 apply only to multiple party accounts.
12. If this is a multiple party account, in consideration of you and your successors carrying a multiple party account on margin or otherwise for the undersigned, each of us agrees to be jointly and severally liable for said account and to pay on demand any debit balance or losses at any time due in this account. Any of us has full power and authority to make purchases and sales, including short sales, to withdraw monies and securities from, or to do anything else with reference to our account, either individually or in our joint names, and you and your successors are authorized and directed to act upon instructions received from any of us and to accept payment and securities from any of us for the credit of this account. Notwithstanding the ability of each of us to control the account individually, we understand and agree that you may, at your sole option, require written instructions signed by all account owners when payments or transfers are requested. Any and all notices, communications, or any demands for margin sent to any of us shall be binding upon all, and may be given by mail or other means of communication. We hereby declare this account to be a joint tenancy with rights of survivorship unless we instruct you to establish another form of multiple ownership by executing a tenancy in common agreement, community property agreement, partnership agreement or other applicable agreement evidencing the desired form of ownership.

13. Each of us agrees to hold SSB harmless from and indemnify SSB against any losses, causes of action, damages and expenses arising from or as the result of SSB following the instructions of either or any of us. SSB, in its sole discretion, may at any time suspend all activity in the multiple party account pending instructions from a court of competent jurisdiction or require that instructions pertaining to the multiple party account or the property therein be in writing signed by both or all of us. SSB shall be entitled to recover from the account or from any of us prior to distribution of the funds or property therein such costs as it may incur, including reasonable attorney's fees, as the result of any dispute between or among us relating to or arising from the account.

14. Each of us agrees that, in the event of the death of either or any of us, the survivor or survivors shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such actions, require such papers, inheritance or estate tax waivers, retain such portion of the account and restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of either or any of us who shall have died shall be liable and each survivor shall continue liable, jointly and severally, to you for any net debit balance or loss in said account in any way resulting from the completion of transactions initiated prior to the receipt by you of the written notice of the death of the decedent, or incurred in the liquidation of the account or the adjustment of the interests of the respective parties.

If this account contains rights of survivorship, in the event of the death of either or any of us, all assets in the account shall pass to and be vested in the survivor or survivors on the same terms and conditions as previously held, without in any manner releasing the decedent's estate from the liabilities provided for herein. The estate of the decedent(s) and the survivors hereby jointly and severally agree to fully indemnify and hold harmless SSB from all liability for any taxes which may be owed in connection therewith or any claims by third parties.

Margin Agreement
Paragraphs 15 through 17 apply only to Margin Accounts
15. You are hereby authorized, without notice to me, and without regard as to whether or not you have in your possession or under your control at the time thereof other property of the same kind and amount, to pledge, repledge, hypothecate or rehypothecate my property or any part thereof, either separately or together with other property of other clients, either for the amount due you from me or for a greater sum.

16. I agree to pay ON DEMAND any balance owing with respect to any of my accounts, including interest and commissions and any costs of collection (including attorneys' fees, if incurred by you). I understand that you may demand full payment of the balance due in my account plus any interest charges accrued thereon, at your sole option, at any time without cause and whether or not such demand is made for your protection. I understand that all loans made are not for any specific term or duration but are due and payable at your discretion upon a demand for payment made to me. I agree that all payments received for my account(s) including interest, dividends, premiums, principal or other payments may be applied by you to any balances due in my account(s). If I maintain both a cash and a margin account with you, you are authorized in your discretion to utilize the equity in either type of account in satisfaction of any maintenance margin requirement without the actual transference of funds or securities between such accounts.

Whenever you deem it necessary or appropriate for your protection, you are authorized, in your sole discretion, to sell, assign, transfer and deliver all or any part of my property which may be in your possession or control in any manner you deem appropriate, make any necessary purchases to cover short sales and/or any open commodity contract positions and/or to cancel any outstanding orders in order to close out the account. Without limiting the generality of the foregoing, such sale, purchase or cancellation may be made, in your sole discretion, on the exchange or other market where such business is then usually transacted, at public auction or at private sale without advertising the same. All of the above may be done without demand for margin or notice of purchase, sale or cancellation to me. No demand for margin, or notice given to me of intent to purchase or sell property or to cancel orders in my account, shall impose on you any obligation to make such demand or provide such notice to me. Any such notice or demand is hereby expressly waived, and no specific demand or notice shall invalidate this waiver. After deducting all costs and expenses of the purchase and/or sale and deliveries, including, but not limited to, commissions and transfer and stamp taxes, you shall apply the residue of the proceeds to the payment of any and all of my liabilities to you, and I shall remain liable for any deficiency. Upon any such sale, you may purchase the whole or any part thereof free from any right of redemption. In the event of my death or incompetency, the authority given by this Paragraph shall continue effective and shall be binding upon my personal representatives and heirs.

17. I will at all times maintain such margin for my account maintained by SSB, as SSB may require from time to time, and any debit balances arising in such account shall be charged interest in accordance with the terms described in the SSB literature previously provided to me and any subsequent modifications thereto which will be provided to me. I am aware that interest charges, if not paid, will be added to the debit balance in my account for the next interest period. I am aware and agree that you may impose, for my account(s), margin requirements more stringent than those required by law or exchange regulations. I further understand and agree that such margin requirements may be changed and modified by you from time to time without prior notice to me. I further agree that any waiver by you or failure to promptly enforce, as to my account or that of others, such margin requirements shall not in any way prevent you from subsequently enforcing said margin requirements with regard to my account.

# Account Application, Client Agreement and Substitute Form W-9 Request for Taxpayer Identification Number

citi smith barney

| Account/ | Account | Y | C | M |
|---|---|---|---|---|
| 620 | 5C | | | |

## Personal Information

**Account Owner**

Name  K & R FAMILY LTD PARTNERSHIP

ATTN: ROY DALE

SS# or Tax ID _____ Date of Birth _____

Citizenship ☑ U.S. ☐ U.S. Permanent Resident Alien

Daytime Phone _____ Evening Phone ___ N/A ___

Fax

Email ___ N/A ___

Account Owner's Mother's Maiden Name

Security Question Account Owner's City of Birth

Mailing Address for this account:

Street Address

City  MCALLEN   State TX   ZIP  78504-3234

This account is for (check appropriate box): ☐ Individual/Joint ☐ Sole Proprietor

**Additional Account Owner(s)**

Name ___ N/A ___

SS# or Tax ID ___ N/A ___   Date of Birth ___ N/A ___

Citizenship ☐ U.S. ☐ U.S. Permanent Resident Alien

**Account Owner**

Name _____ N/A _____

SS# or Tax ID ___ N/A ___   Date of Birth ___ N/A ___

Citizenship ☐ U.S. ☐ U.S. Permanent Resident Alien

Daytime Phone ___ N/A ___   Evening Phone ___ N/A ___

Fax ___ N/A ___   ___ N/A ___

Email ___ N/A ___   ___ N/A ___

Account Owner's Mother's Maiden Name ___ N/A ___

Security Question Account Owner's City of Birth ___ N/A ___

Permanent Legal Address for this account (if different than Mailing Address)

Street Address

City _____   State _____   ZIP _____

☐ Corporation ☑ Partnership ☐ Other (specify)

Name ___ N/A ___

SS# or Tax ID ___ N/A ___   Date of Birth ___ N/A ___

Citizenship ☐ U.S. ☐ U.S. Permanent Resident Alien

U.S. Federal law requires us to obtain, verify and record information that identifies each person or entity that opens an account. What this means for you is that when you open an account, we will ask for your name, a street address, date of birth, and an identification number, such as a Social Security No. or other identification number, that Federal law requires us to obtain. We may also ask to see a driver's license, corporate formation documents (for corporate entities), or other identifying documents that will allow us to identify you or the nonperson entity seeking to open an account. We appreciate your cooperation.

3025-NAS (4/2007) Page 1 of 7

Smith Barney is a division and service mark of Citigroup Global Markets Inc.

REDACTED

EXHIBIT
4

## Alternate Mail Instructions

Complete this section if you desire another individual to receive mail on your behalf. The individual you designate MUST qualify as a "special custodian," which is defined as someone who is not authorized to withdraw funds or securities from your account, AND; is not authorized to place orders or move assets for you, AND is not affiliated with a broker/dealer or registered investment advisor.

Please direct all communications, including trade confirmations and monthly statements, for any account indicated above, to the special custodian designated below. This instruction will remain in effect until written notice to the contrary is received by you at the branch office servicing my account. (See Paragraph 12 Page 5)

Name

| Street Address | | City | | State | ZIP |
|---|---|---|---|---|---|

## Smith Barney Access℠ smithbarney.com

Using Smith Barney Access, our free internet-based service, you may view your investment portfolio, account activity, research and news headlines, pay bills online, transfer funds electronically (AFT℠), receive electronic delivery of your statements, trade confirmations and other documents, customize your homepage, send secure e-mail to your Smith Barney Financial Advisor, and download information to your computer.

To enroll in Access, go to www.smithbarney.com. The account owner's mother's maiden name is required for online enrollment. If you have not already provided it in the Personal Information section above, please do so. Speak to your Financial Advisor regarding our free Smith Barney Access Internet Bill Pay service.

## Sweep Fund

Sweep allows your idle cash to be invested automatically. Choose where you would like your cash to be invested. Please check one. *The FMA account has a daily sweep.*

- ☐ Bank Deposit Program℠ – FDIC-insured deposits in affiliated Citigroup banks (note: not available for managed accounts or business accounts)
- ☐ Tax-free money market fund
- ☐ Money market fund (subject to eligibility rules in the *Sweep Features* section of the *Important Note Account Information* material)

## Borrowing Privileges

Portfolio CreditLine℠ (margin) allows you to borrow against the value of eligible securities in your account for almost any investment, personal or business purpose. Eligible accounts will have Portfolio CreditLine borrowing privileges unless you decline below. See accompanying literature for an explanation of Portfolio CreditLine borrowing.

☐ We do not want Portfolio CreditLine borrowing privileges in my/our account.

## Dividend Reinvestment

☐ Reinvest dividends into additional shares automatically (fees may apply). Speak to your Financial Advisor to select which dividends to reinvest.

## FMA®/FMA PLUS℠ Account

The FMA/FMA PLUS Account gives you convenient access to the funds in your account and simplifies your daily financial management needs. *By selecting any of the FMA features, you will be set up automatically with an FMA account. An annual account fee may apply for an FMA/FMA PLUS account.*

Indicate your choice of account type:
*Note: Portfolio Accounts will be automatically established as a Premium FMA.*

- ☐ Financial Management Account℠ (FMA®)
- ☐ FMA PLUS (Unlimited free ATM withdrawals with the FMA Card, two complimentary IRAs linked to your account, all stop payment fees waived and unlimited free check copies.)

| Check Writing — Check writing privileges provide you with convenient access to your money. Choose your check imprint and style preference. | Check Imprint<br>☐ Name and Address<br>☐ Name only no address | Check Style Preference:<br>☐ Wallet Size<br>☐ Wallet Size with Duplicate (Additional Charge) | ☐ Executive (additional charge)<br>☐ Corporate (additional charge) |
|---|---|---|---|

Multiple owner accounts—please tell us if one or two signatures are required to authorize checks ☐ One signature required  ☐ Two signatures required

Smith Barney is a division and service mark of Citigroup Global Markets Inc.

REDACTED

**FMA Card –** The FMA Card is a Gold MasterCard® that gives you easy access to the available funds in your FMA account at ATM machines worldwide and affords you purchasing power wherever MasterCard is accepted. You can also use the FMA Card to deposit into and withdraw from your FMA account at Citibank Financial Centers in the U.S. and Puerto Rico. No annual card fee applies. ATM fees waived at Citibank and MoneyPass locations. Some account types may not be eligible for the FMA Card.

| How should the account owner's name appear? | Maximum number of characters is 30 | 30 | Mother's Maiden Name | Access Level** ☐ Full ☐ Limited |
|---|---|---|---|---|
| How should the account owner's name appear? | Maximum number of characters is 34 | 34 | Mother's Maiden Name | Access Level** ☐ Full ☐ Limited |

**A card holder designated as having Full Access will have the ability to withdraw funds directly from the related FMA account at a Citibank Teller in the U.S. and Puerto Rico, in an amount up to the total funds available in such FMA account. Total funds available include cash, savings deposits linked through your SDP, money fund balances and available margin loan value, extent uncleared funds and pending FMA Card transactions.

**A card holder designated as having Limited Access will have the ability to withdraw funds at a teller through a cash advance on the related FMA Card up to the lesser of 1) total cash available in the related FMA account or 2) the daily spending withdrawal limit set by Smith Barney.

If you do not select an Access Level, the card holder will be designated Full Access.

| Travel & Rewards | ☐ Yes, sign my FMA Card(s) up for the Travel & Rewards program so I can begin earning points with my first eligible purchase. A $50 annual membership fee may apply. |
|---|---|

**Automatic Funds Transfer –** Transfer money by phone or online between your FMA and another U.S. financial institution, or to another Smith Barney account that has been linked to your FMA account for statement reporting purposes.

Attach a voided check or a letter from your financial institution confirming the account number, title, account type (checking or savings) and the routing number (not required for transfers to Smith Barney accounts). Your account must have the name of at least one FMA account owner in the title. Speak to your Financial Advisor for trust and estate ownership requirements.

| Financial Institution | | Account Number | |
|---|---|---|---|
| Type of Account   ☐ Checking   ☐ Savings | | Select your 4-Digit Telephone Authorization Code (numbers only) | |

Automatic Funds Transfer can be made at the branch and the internet service, Smith Barney Access, with an enabled Clientserv ID. Contact your Financial Advisor to obtain an Electronic Client ID or to enable an existing one.

**Optional – Complete only if you wish to establish monthly or biweekly recurring transfers.**
I would like to establish a recurring transfer in the amount of ($100 minimum): $ _____    ☐ INTO my FMA account    ☐ FROM my FMA account

| Frequency: | ☐ Monthly, on the ☐☐☐ day of each month (specify the 1st through 28th) OR Biweekly on ☐ Mon ☐ Tue ☐ Wed ☐ Thu ☐ Fri |
|---|---|

| Complete this section only if your account title at another U.S. financial institution includes someone who is not a co-owner of your FMA account. | I authorize Smith Barney ("SB") to initiate transfers and make adjustments for entries made in error to or from my account indicated above, in accordance with the terms of the FMA Agreement, which I have read and agree to. This authorization is to remain in full force and effect until SB has received notification from me of its termination. |
|---|---|
| | Account Title |
| | Signature of non-FMA owner(s)                                    Date |

## Name Disclosure

The issuers of securities we hold for you in street name may request your name, address and securities position. This information will not be released if you check this box. ☐

Bank issued certificates of deposit purchased through Smith Barney and the Smith Barney Bank Deposit Program are insured by the FDIC (see disclosure documents for details). All other investment or insurance products sold through Smith Barney:
• are not insured by the FDIC;
• are not a deposit or other obligation of a depository institution and are not guaranteed by a depository institution;
• are subject to investment risks, including the possible loss of the principal amount invested.

In consideration of Citigroup Global Markets Inc. ("you") accepting an account for me/us, I/we ("I") acknowledge that I have read, understand and agree to the terms of the attached Client Agreement in sections 1 through 12. If this is a multiple party account, I further acknowledge that I have read, understand and agree to the terms of the attached Client Agreement contained in sections 13 through 18. If I have requested Smith Barney Access, I have read, understand, and agree to the terms of the Smith Barney attached Client Agreement contained in sections 13 through 18.

3026-NAS (4/2007) Page 3 of 7                                    Smith Barney is a division and service mark of Citigroup Global Markets Inc.

REDACTED

*K & R Family Ltd Ps*

Account Number
Branch ___ Account ___   T   C   SA
620   5 C

**Access Agreement.** If I have requested any of the services referenced in the FMA sections above, I agree to the terms of the FMA Agreement that has been provided to me and understand that both an account minimum balance and annual fee apply. I authorize you to establish checking privileges, Online Services and the Automatic Funds Transfer service, and to have the FMA Card(s) issued as instructed (including the designated Access Levels) on this Account Application, and if sitting that I have the authority to open this account. I authorize you and the FMA Card issuer to have FMA Card(s) issued as indicated (including the designated Access Levels). I understand that this account is governed by the FMA Agreement, the CDbps Agreement, the Online Services Agreement, any agreement with the FMA Card issuer, the Bank Deposit Program Disclosure Document, and/or other agreements I may have with you or other providers of services subject to the FMA account. I have read all those documents and agree to their terms. If this account is established with PortfolioCreditLine (margin) privileges, I further acknowledge that I have read, understand and agree to the terms of the attached Client Agreement contained in sections (B through 18 and that myher securities may be loaned to you or loaned out to others.

**Tax Certification Under penalties of perjury I certify that:**
1.) The number I have provided above is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and
2.) I am not subject to backup withholding because a.) I am exempt from backup withholding, or b.) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or c.) the IRS has notified me that I am no longer subject to backup withholding;
3.) I am a U.S. person (including a U.S. resident alien)
**Certification Instructions:** You must cross out item (2) above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

*Smith Barney requires your account in the applicable provisions of this Agreement in order to open and maintain your account.*
*An account cannot exist sign. If FMA Checking is requested, please sign as you will actually sign your checks.*

I acknowledge that I have received a copy of the Client Agreement which contains    *The Internal Revenue Service does not require your consent to any provision of this*
a pre-dispute arbitration clause on page 5 of 7, section 3,    *document other than the certifications required to avoid backup withholding.*

| | | |
|---|---|---|
| Account Owner Signature | *[signature]* As Gen'l Partner | Date 06/25/07 |
| Account Owner Signature | | Date |
| Additional Account Owner Signature | | Date |
| Additional Account Owner Signature | | Date |

3028-NAS (4/2007) Page 4 of 7

Smith Barney is a division and service mark of Citigroup Global Markets Inc.

REDACTED

# CLIENT AGREEMENT

In consideration of your opening one or more accounts for me ("we", "us" and "our" are each respectively for "I", "me" and "my", respectively, in the case of multiple account holders, corporations and other entities), and your agreeing to act as broker/dealer for me for the extension of credit and in the purchase or sale of securities, commodities, options and other property, it is agreed in respect to any and all accounts, whether upon margin or otherwise, which I now have or may at any future time have with Citigroup Global Markets Inc. or its direct or indirect subsidiaries and affiliates or their successors or assigns (hereinafter referred to as "you", "your", "SB" or "Smith Barney"), that:

1. All transactions entered into under this Agreement shall be subject to any applicable constitution, rules, regulations, customs and usages of the exchange or market and its clearinghouse, if any, where such transactions are executed by SB or its agents and to all applicable laws, rules and regulations of governmental authorities and self-regulatory agencies. Such reference to the "constitution, rules, regulations, customs and usages of the exchange" shall in no way be construed to create a cause of action arising from any violation of such constitution, rules, regulations, customs and usages. If any provision is enacted that would be inconsistent with any of the provisions of this Agreement, the provision so affected shall be deemed modified or superseded by the enactment, but the remaining provisions of this Agreement shall remain in effect. Except as herein provided, no provision of this Agreement may be waived, altered, modified or amended unless the same is in writing and signed by an authorized official of SB.

2. I agree that all property which I own or in which I have an ownership interest, whether owned individually, jointly or in the name of another person or entity, which at any time may be in your possession or control for any purpose, including safekeeping, shall be subject to a continuing security interest, lien and right of set-off for the discharge and satisfaction of any debts or obligations however arising that I may owe to SB at any time and for any reason. SB may at its discretion hold such property until my debts or obligations to SB are fully satisfied and SB may apply such property and the proceeds of the liquidation of such property toward the satisfaction of my debts and obligations and I will remain liable to SB for any deficiency. In enforcing your security interest, you shall have the discretion to determine which property is to be sold and the order in which it is to be sold and shall have all the rights and remedies available to a secured party under the New York Uniform Commercial Code. Without your prior written consent, I will not cause or allow any of the collateral held in my account(s), whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances of any nature other than your security interest.

Without limiting the generality of the foregoing, I hereby authorize SB to automatically liquidate any money market fund shares or withdraw any savings deposit balances available in my account(s) from time to time to cover any of my indebtedness or obligations to SB including non-trade related debts. You are further authorized to liquidate any other property held in my account(s) to satisfy any such indebtedness or obligations whenever in your discretion you consider it necessary for your protection. You are hereby authorized without further direction from me to automatically deposit or "sweep" all the free credit balances in my account into one or more FDIC insured depository institutions ("Program Banks") affiliated with you as more particularly set forth in the disclosure document which I represent that I have read and by which I agree to be bound. I understand that you may amend the list of Program Banks and that I may eliminate any Program Bank from the list at any time. If my free credit balances that are swept into the Program Banks reach the maximum amount that I have authorized you on my behalf to deposit or that may be so deposited under the Bank Deposit Program ("Program"), you are authorized to sweep, without further direction from me, my excess eligible free credit balances into the SB Money Fund portfolio that I have chosen.

I acknowledge (i) that I am responsible to monitor the total amount of deposits I have at each Program Bank in order to determine the extent of Federal Deposit Insurance

Corporation insurance coverage available to me, and (ii) that SB is not responsible for any insured or uninsured portion of my deposits at any of the Program Banks.

I understand that I may instruct you not to sweep the free credit balances in any of my accounts into a Program Bank account but instead to sweep such free credit balances into a tax exempt money market fund. If I so instruct you, you are authorized, without further direction from me, to invest any eligible free credit balances in any of my accounts in the tax exempt money market fund you make available and that I have chosen.

"Property" as used anywhere in this Agreement shall include, but not be limited to, investment property, securities and commodities accounts, securities of all kinds, money, savings deposits, certificates of deposit, bankers' acceptances, commercial paper, options, commodities, and contracts for the future delivery of commodities or relating to commodities or securities, and the distributions, proceeds, products and accessions of any of the above. All property held in a securities account shall be treated as a financial asset under Article 8 of the New York Uniform Commercial Code.

3. If I instruct you to sell an equity security that you designate as a "long" sale, and you are unable to deliver the security to the purchaser as a result of my failure to provide the security to you, I acknowledge that you are required by law to purchase (i.e., "buy-in") a security of like kind and quantity from a third party in order to deliver the security to the purchaser. I understand that in these circumstances, you will not borrow the security to make delivery to the purchaser unless: (i) in advance of such sale, you knew, or I informed you, that I owned the security and would deliver it to you prior to the scheduled settlement for the sale, and I failed to make such delivery, or (ii) a securities exchange or securities association permits you to borrow the security. I agree to be responsible for any loss which you may sustain through a buy-in or borrowing and any premiums, interest or other costs which you may be required to pay as a result of such buy-in or borrowing, or the inability to make a buy-in or borrowing.

4. Communications may be sent to the mailing address on file with you, or at such other address as I may hereafter give in writing, and all communications so sent, whether by mail, telegraph, messenger or otherwise, shall be deemed given to me personally, whether actually received or not. I acknowledge that the rules of the Securities and Exchange Commission require that certain communications be sent to me rather than an agent acting on my behalf. I warrant that the address currently on file with you is an address where I personally receive communications unless it is the address of a qualified custodian as defined by the Securities and Exchange Commission. Transactions entered into for my account(s) shall be confirmed in writing to me where required by applicable law or regulation. In addition, SB shall provide me with periodic statements reflecting activity in such account(s). I agree that transactions reflected on such confirmations and statements shall be conclusively deemed accurate as stated unless I notify SB in writing within three (3) days and ten (10) days of receipt, respectively, that the information contained in such confirmation or statement is inaccurate. Such notice must be sent by me to SB by telegram or letter directed to the attention of the Branch Office Manager of the office servicing the account. Failure to so notify SB shall also preclude me from asserting at any later date that such transaction was unauthorized.

I authorize you at your discretion to obtain reports and to provide information to others concerning my credit standing and my business conduct. You may ask credit reporting agencies for consumer reports of my credit history. Upon my request you will inform me whether you have obtained any such consumer reports and if you have, you will inform me of the name and address of the consumer reporting agency that furnished the reports to you.

5. I hereby represent that I am of the age of majority. Unless I advise you to the contrary, in writing, and provide you with a letter of approval from my employer, where required, I represent that I am not an employee of any exchange, or of any corporation of which any exchange owns a majority of the capital stock, or of a member of any

## KEEP THIS FOR YOUR RECORDS

Smith Barney is a division and service mark of Citigroup Global Markets Inc.

exchange, or of a member firm or member corporation registered on any exchange, or of any corporation, firm or individual engaged in the business of dealing, either as a broker or as principal, in securities, bills of exchange, acceptances or other forms of commercial paper. I further represent that no one except those signing this agreement has an interest in my account.

If my account has been introduced to you and is carried by you only as a clearing broker, I agree that you are not responsible for the conduct of the introducing broker and your only responsibilities to me relate to the execution, clearing and bookkeeping of transactions in my accounts.

**6. Arbitration**

This agreement contains a pre-dispute arbitration clause. By signing an arbitration agreement the parties agree as follows:

• All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

• Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.

• The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.

• The arbitrators do not have to explain the reason(s) for their award.

• The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

• The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.

• The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

I agree that all claims or controversies, whether such claims or controversies arose prior, on or subsequent to the date hereof, between me and SB and/or any of its present or former officers, directors, or employees concerning or arising from (i) any account maintained by me with SB individually or jointly with others in any capacity; (ii) any transaction involving SB or any predecessor firms by merger, acquisition or other business combination and me, whether or not such transaction occurred in such account or accounts; or (iii) the construction, performance or breach of this or any other agreement between us, any duty arising from the business of SB or otherwise, shall be determined by arbitration before, and only before, any self-regulatory organization or exchange of which SB is a member. I may elect which of these arbitration forums shall hear the matter by sending a registered letter or telegram addressed to Smith Barney at 77 Water Street, New York, N.Y. 10005, Attn: Law Department. If I fail to make such election before the expiration of five (5) days after receipt of a written request from SB to make such election, SB shall have the right to choose the forum.

No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; (ii) the class is decertified; or (iii) the person is excluded from the class by the court.

Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

7. The provisions of this Agreement shall be continuous, shall cover individually and collectively all accounts which I may open or reopen with SB, and shall inure to the benefit of SB's present organization, and any successor organization or assigns; and shall be binding upon my heirs, executors, administrators, assigns or successors in interest. Should any term or provision of this Agreement be deemed or held to be invalid or unenforceable, the remaining terms and provisions shall continue in full force and effect. Except for statutes of limitation applicable to claims, this Agreement

and all the terms herein shall be governed and construed in accordance with the laws of the State of New York without giving effect to principles of conflict of laws. The statute of limitations applicable to any claim shall be that which would be applied by the courts of the state in which I reside or if I do not reside in the United States, the statute of limitations shall be that which would be applied by the courts in the state where the SB office servicing my account(s)is located.

8. I understand that you may in your sole discretion prohibit or restrict trading of securities or substitution of securities in any of my accounts. You have the right to terminate any of my accounts (including multiple owner accounts) at any time by notice to me. The provisions of this agreement shall survive the termination of any account.

9. Your failure to insist at any time upon strict compliance with any term of this Agreement, or any delay or failure on your part to exercise any power or right given to you in this Agreement, or a continued course of such conduct on your part shall at no time operate as a waiver of such power or right, nor shall any single or partial exercise preclude any other further exercise. All rights and remedies given to you in this Agreement are cumulative and not exclusive of any other rights or remedies which you otherwise have.

10. I understand that SB shall not be liable for loss caused directly or indirectly by government restrictions, exchange or market rulings, suspension of trading, war, terrorist acts, strikes or other conditions, commonly known as "acts of God," beyond SB's control.

11. From time to time you may at your discretion, make loans to me for a purpose other than purchasing, carrying or trading in securities ("Express Credit Loans"). Express Credit Loans will be made in a good-faith account established pursuant to Federal Reserve Board Regulation T ("Express Credit Account"). The minimum and maximum amount of any particular loan may be established by you in your discretion regardless of the amount of collateral delivered to you and you may change such minimum and maximum amounts from time to time.

I agree not to use the proceeds of any Express Credit Loan to purchase, carry or trade in securities. I also agree not to use Express Credit Loan proceeds directly or indirectly to repay other debt that I incur for the purpose of purchasing, carrying or trading in securities.

12. If I have designated another individual to receive my communications from you pursuant to the Alternate Mail Instruction on Page 1, I agree that the instruction is applicable to all communications including but not limited to proxies, prospectuses, confirmations and statements of account. In consideration of your accepting and acting upon that instruction, I agree that all such communications shall be deemed for all purposes to have been personally received by me on the date indicated in such communication. I further agree to indemnify and hold harmless you, your officers, directors and employees from any and all liabilities arising from your compliance with these instructions and I hereby specifically waive any claims arising from my election to not promptly review transactions posted to my account.

**Additional Terms for Multiple Party Accounts**

Paragraphs 13 through 15 apply only to multiple party accounts.

13. If this is a multiple party account, in consideration of you and your successors carrying a multiple party account on margin or otherwise for the undersigned, each of us agrees to be jointly and severally liable for said account and to pay on demand any debit balance or losses at any time due in this account. Any of us has full power and authority to make purchases and sales, including short sales, to withdraw monies and securities from, or to do anything else with reference to our account, either individually or in our joint names, and you and your successors are authorized and directed to act upon instructions received from any of us and to accept payment and securities from any of us for the credit of this account. Notwithstanding the ability of each of us to control the account individually, we understand and agree that you may, at your sole option, require written instructions signed by all account owners when payments or transfers are requested. Any and all notices, communications,

**KEEP THIS FOR YOUR RECORDS**

Smith Barney is a division and service mark of Citigroup Global Markets Inc.

or any demands for margin sent to any of us shall be binding upon all, and may be given by mail or other means of communication. We hereby declare this account to be a joint tenancy with rights of survivorship unless we instruct you to establish another form of multiple ownership by executing a tenancy in common agreement, community property agreement, partnership agreement or other applicable agreement evidencing the desired form of ownership.

14. Each of us agrees to hold SB harmless from and indemnify SB against any losses, causes of action, damages and expenses arising from or as the result of SB following the instructions of either or any of us. SB, in its sole discretion, may at any time suspend all activity in the multiple party account pending instructions from a court of competent jurisdiction or require that instructions pertaining to the multiple party account or the property therein be in writing signed by both or all of us. SB shall be entitled to recover from the account or from any of us prior to distribution of the funds or property therein such costs as it may incur, including reasonable attorney's fees, as the result of any dispute between or among us relating to or arising from the account.

15. Each of us agrees that, in the event of the death of either or any of us, the survivor or survivors shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such actions, require such papers, inheritance or estate tax waivers, retain such portion of the account and restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. The estate of either or any of us who shall have died shall be liable and each survivor shall continue liable, jointly and severally, to you for any net debit balance or loss in said account in any way resulting from the completion of transactions initiated prior to the receipt by you of the written notice of the death of the decedent, or incurred in the liquidation of the account or the adjustment of the interests of the respective parties.

If this account contains rights of survivorship, in the event of the death of either or any of us, all assets in the account shall pass to and be vested in the survivor or survivors on the same terms and conditions as previously held, without in any manner releasing the decedent's estate from the liabilities provided for herein. The estate of the decedent(s) and the survivors hereby jointly and severally agree to fully indemnify and hold harmless SB from all liability for any taxes which may be owed in connection therewith or any claims by third parties.

**Margin Agreement**
**Paragraphs 16 through 18 apply only to Margin Accounts**

16. You are hereby authorized, without notice to me, and without regard as to whether or not you have in your possession or under your control at the time thereof other property of the same kind and amount, to pledge, repledge, hypothecate or rehypothecate my property or any part thereof, either separately or together with other property of other clients, either for the amount due you from me or for a greater sum.

17. Unless I select an interest rate that is fixed for a specific period of time (a 'Fixed Rate Loan'), I agree to pay ON DEMAND any balance owing with respect to any of my accounts, including interest and commissions and any costs of collection (including attorneys' fees, if incurred by you). I understand that you may demand full payment of the balance due in my account plus any interest charges accrued thereon, at your sole option, at any time without cause and whether or not such demand is made for your protection. I understand that all loans made are not for any specific term or duration but are due and payable at your discretion upon a demand for payment made to me. I agree that all payments received for my account(s) including interest, dividends, premiums, principal or other payments may be applied by you to any balances due in my account(s). If I maintain both a cash and a margin account with you, you are authorized in your discretion to utilize the equity in either type of account in satisfaction of any maintenance margin requirement without the actual transference of funds or securities between such accounts.

If I select a Fixed Rate Loan, the fixed interest rate will be based on the one-, three-, six -or twelve-month London Interbank Offered Rate ("LIBOR") selected by me (or other maturity that SB may offer from time to time) plus a mutually agreeable incremental amount added to this rate. The term of the Fixed Rate Loan will correspond to the LIBOR rate selected by me, and the LIBOR rate will remain in effect for such term despite the on-going variable nature of LIBOR. I understand that at the end of such term, I may pay my Fixed Rate Loan in full or renew it for the same or a different LIBOR term based upon the LIBOR rates then in effect on the first business day of the renewal term. I understand that if I do not specifically select either option, I will obtain a loan payable on demand and based upon the Prime Rate, as described in SB literature that has been provided to me. I also understand that if I re-pay my Fixed Rate Loan in whole or in part prior to the expiration of its term, I will be required to pay a "breakage fee," which will be determined by SB in the manner described in the SB literature that has been provided to me. SB reserves the right to stop making Fixed Rate Loans at any time, but if I have a Fixed Rate Loan in existence on the date SB stops making such loans, my loan will not be affected. I agree that all payments received for my account(s), including interest, dividends, premiums, principal or other payments, may be applied by you to any balances due in my account(s). If I maintain both a cash and a margin account with you, you are authorized in your discretion to utilize the equity in either type of account in satisfaction of any maintenance margin requirement without the actual transference of funds or securities between such accounts.

Whenever you deem it necessary or appropriate for your protection in connection with a DEMAND loan or a Fixed Rate Loan, you are authorized, in your sole discretion, to, sell, assign, transfer and deliver all or any part of my property which may be in your possession or control in any manner you deem appropriate, make any necessary purchases to cover short sales and/or any open commodity contract positions and/or to cancel any outstanding orders in order to close out the account. Without limiting the generality of the foregoing, such sale, purchase or cancellation may be made, in your sole discretion, on the exchange or other market where such business is then usually transacted, at public auction or at private sale without advertising the same. All of the above may be done without demand for margin or notice of purchase, sale or cancellation to me. No demand for margin, or notice given to me of intent to purchase or sell property or to cancel orders in my account, shall impose on you any obligation to make such demand or provide such notice to me. Any such notice or demand is hereby expressly waived, and no specific demand or notice shall invalidate this waiver. After deducting all costs and expenses of the purchase and/or sale and deliveries, including, but not limited to, commissions and transfer and stamp taxes, you shall apply the residue of the proceeds to the payment of any and all of my liabilities to you, and I shall remain liable for any deficiency. Upon any such sale, you may purchase the whole or any part thereof free from any right of redemption. In the event of my death or incompetency, the authority given by this Paragraph shall continue effective and shall be binding upon my personal representatives and heirs.

18. I will at all times maintain such margin for my account maintained by SB, as SB may require from time to time, and any debit balances arising in such account shall be charged interest in accordance with the terms described in the SB literature previously provided to me and any subsequent modifications thereto which will be provided to me. I am aware that interest charges, if not paid, will be added to the debit balance in my account for the next interest period. I am aware and agree that you may impose, for my account(s), margin requirements more stringent than those required by law or exchange regulations. I further understand and agree that such margin requirements may be changed and modified by you from time to time without prior notice to me. I further agree that any waiver by you or failure to promptly enforce, as to my account or that of others, such margin requirements shall not in any way prevent you from subsequently enforcing said margin requirements with regard to my account.

**KEEP THIS FOR YOUR RECORDS**

Smith Barney is a division and service mark of Citigroup Global Markets Inc.